425 S.E.2d 609

**Sylvia HILL, By Her Committee, Donald HILL; and Donald Hill, Committee for Sylvia HILL, Plaintiff Below, Appellants,**

**v.**

**SHOWA DENKO, K.K., a Japanese Corporation; Showa Denko America, Inc., a New York Corporation; P. Leiner Nutritional Products, Inc., of Delaware, a Delaware Corporation; P. Leiner Nutritional Products Corp., a California Corporation; Rite Aid Corporation, a Delaware Corporation; Rite Aid of West Virginia, Inc., a West Virginia Corporation, Defendants Below,**

**Showa Denko, K.K., a Japanese Corporation, Appellee.**

**No. 20904.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1992.

Decided Dec. 17, 1992.

---

Marvin W. Masters and Barbara H. Lupton, Masters & Taylor, Charleston, for appellants.

P. Michael Pleska, Fazal A. Shere, Bowles, Rice, McDavid, Graff & Love, Charleston, Richard W. Hulbert, Cleary, Gottlieb, Steen & Hamilton, New York City, and Richard deC. Hinds, Sara D. Schotland, and Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for appellee, Showa Denko K.K.

BROTHERTON, Justice:

This case involves the appeal of Sylvia and Donald Hill from the June 18, 1991, order of the Circuit Court of Kanawha County in which Showa Denko K.K. (SDK) was dismissed from a lawsuit filed by the Hills against SDK and several other parties. In that order, Judge Hey found that West Virginia could not exercise personal jurisdiction over SDK.

On December 22, 1988, Sylvia Hill became ill while taking a drug L-tryptophan for a sleep disorder, on the advice of her physician. It was eventually discovered that she had developed a rare blood disorder, Eosinophilia–Myalgia Syndrome (EMS). Mrs. Hill is currently in a nursing home and unable to walk, sit up, or care for herself. On August 22, 1990, the appel-

lants filed suit against the appellees in Kanawha County Circuit Court.

Through discovery, it was elicited that L-tryptophan is an essential amino acid which was until recently sold over the counter, and commonly used to help with insomnia, premenstrual syndrome, weight control, pain relief, and depression. In November, 1989, the FDA issued a recall of products containing L-tryptophan after hearing reports of at least 1500 EMS cases, including twenty-seven deaths, in which the only factor common to those cases was that those who contracted the disease had taken products containing L-tryptophan. It was subsequently discovered that it was not the L-tryptophan itself which caused the disease, but rather a contaminated L-tryptophan product. According to a New England Journal of Medicine article, the contaminated L-tryptophan was traced to SDK. The article determined that the contamination occurred when SDK converted to a less expensive method of manufacturing L-tryptophan, and apparently omitted some of the purification process.

Also named in the suit was Rite–Aid Pharmacies, from whom Mrs. Hill obtained her prescription of L-tryptophan. Rite–Aid received their supply of L-tryptophan from P. Leiner Nutritional Products, an American processor and distributor of drug and health food products. In 1988, Leiner obtained its supply of raw L-tryptophan from four suppliers. One of them was Showa Denko America, Inc. (SDA), a wholly owned subsidiary of SDK and SDK's sole American distributor for the raw materials it manufactures. In 1989 Leiner obtained all of its bulk raw L-tryptophan from SDA.

SDK owns 100% of SDA stock. One of SDA's three corporate directors is an employee of SDK. SDA's principal business is the purchase, importation, and resale of SDK's products for sale in the United States, and maintains warehouses in California and New Jersey. In 1989, SDA purchased over $10.1 million of products from SDK for resale in the United States. SDK is a Japanese corporation with its headquarters in Tokyo. The corporation's stock is traded only on the Japanese stock exchanges and not in the United States. All of their manufacturing and research facilities are in Japan, and they have no offices or places of business in the State of West Virginia or in the United States. SDK states that it owns no real property in the United States and does not file tax returns with the United States Internal Revenue Service or the West Virginia Tax Department. SDK's business falls into three general categories: (1) petrochemicals, (2) ceramics and materials, and (c) chemicals and carbon. The sales of L-tryptophan fall into the third category.

In its discovery responses, the appellants point out that SDA admitted that when it learned of the possible link between their product and the disease EMS, it immediately notified SDK. After investigation, SDK ordered SDA to "cease immediately any further sales of L-tryptophan."

On October 9, 1990, SDK filed a motion to dismiss the claim against it on grounds of lack of personal jurisdiction and insufficiency of service of process.[1] On April 5, 1991, a hearing was held on the motion to dismiss. The parties submitted proposed findings of fact and conclusions of law on the issue of whether there was sufficient personal jurisdiction over SDK. On June 18, 1991, Judge John Hey found that there was not sufficient personal jurisdiction over SDK and thus, SDK was dismissed from the suit. The appellants filed this petition for appeal from that final ruling and urge this Court to adopt the stream of commerce theory of establishing personal jurisdiction.

Our analysis of personal jurisdiction must begin with a review of the United States Supreme Court's decision in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *International Shoe*, the Supreme Court first set forth the elements necessary to subject a nonresident defendant to the jurisdiction of the forum state:

> [I]n order to subject a defendant to a judgment if he be not present within the

---

**1.** The objection to service of process was eventually mooted and is not before this Court.

territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316, 66 S.Ct. at 158. The Court noted that "the quality and nature of the activity in relation to the fair and orderly administration of the laws" is the critical element rather than the volume of the activity. *Id.* at 319, 66 S.Ct. at 159. Defining "minimum contacts" has been an ongoing process for the Court, made especially complex in recent years by the increase in international trade.

In *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Supreme Court further defined the concept of minimum contacts and ruled that jurisdiction cannot be asserted over a defendant with which a state has no contacts, no ties, and no relations. *Id.* at 294, 100 S.Ct. at 565. In order to satisfy due process, the Court held that "the defendant's conduct in connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. In setting the limits necessary to establish reasonable contacts, the Supreme Court commented that:

> The relationship between the defendant and the forum must be such that it is "reasonable ... to require the corporation to defend the particular suit which is brought there." (Citations omitted.) Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be

---

2. *See also Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

3. *See Cunningham v. Subaru of America, Inc.,* 631 F.Supp. 132 (D.Kan.1986), in which the plaintiff claimed that he was injured as a result of the design, manufacture and distribution of the Subaru Brat truck. The defendant, a Japanese corporation, had designed, manufactured and sold Subaru trucks to the defendant, Subaru of America, Inc., in Tokyo. Thus, the defendant maintained that its only contact with the United States was the sale of these vehicles in Tokyo and that it had no "minimum contacts" sufficient to support an exercise of jurisdiction in the forum state. The federal court disagreed: ·

considered in light of other relevant factors, including the forum state's interest in adjudicating the dispute, *see McGee v. Inter. Life. Ins. Co.,* 355 U.S. 220, 223, 2 L.Ed.2d 223, 78 S.Ct. 199 [201] (1957), the plaintiff's interest in obtaining convenient and effective relief, *see Kulko v. California Superior Court, supra,* [436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)], at least when that interest is not adequately protected by the plaintiff's power to choose the forum, *cf. Shaffer v. Heitner,* 433 U.S. 186, 211 n. 37, 53 L.Ed.2d 683, 97 S.Ct. 2569 [2583 n. 37] (1977), the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, *see Kulko v. California Superior Court,* [436 U.S. at 93, 98, 98 S.Ct. 1690, 1700, 56 L.Ed.2d 132, 142, 145 (1978)].

*Id.* at 292, 100 S.Ct. at 564.[2]

The appellant urges this Court to adopt the stream of commerce theory for establishing minimum contacts as defined in *Keckler v. Brookwood Country Club,* 248 F.Supp. 645 (N.D.Ill.1965):

> When a manufacturer voluntarily chooses to sell his product in a way in which it will be resold from dealer to dealer, transferred from hand to hand and transported from state to state, he cannot reasonably claim that he is surprised at being held to answer in *any* state for the damage the product causes.

*Id.* at 649. The appellants contend that a number of states have adopted this theory and urge this Court to adopt it as well.[3]

> While Fuji [the defendant] greatly profits from the sale of Subaru Brat vehicles in the United States, it claims that it is immune from all jurisdictional claims against it in the United States. The court views this as a company which seeks to reap all of the benefits without incurring the resulting liabilities and costs.... The court finds that Kansas' interest in asserting jurisdiction over Fuji in this action is substantial. Any inconvenience to defendant in defending this lawsuit is clearly outweighed by Kansas' interest in protecting its citizens from injury. The court finds that it would be fundamentally unfair to allow a foreign manufacturer to insulate himself

The United States Supreme Court addressed the stream of commerce theory of personal jurisdiction in *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). *Asahi* involved Japanese tire valve assemblies manufactured in Japan and sold to several tire manufacturers, including a Taiwanese company. The sale took place in Taiwan. The Taiwanese company then sold the completed tires all over the world, including the United States. In 1978, an accident occurred in California involving a tire manufactured by the Taiwanese company. Shortly thereafter, the driver filed suit in California against the Taiwanese company, who filed a cross-claim for indemnity against the Japanese company (Asahi), among others. The driver later settled his claims against the defendants, leaving only the cross-claim between the Taiwanese and Japanese companies.

Although the *Asahi* Court split on whether placing a product into the stream of commerce, without more, was sufficient to allow the forum state to exercise personal jurisdiction over the manufacturer of a defective product, three members of the Court stated, in Part II–A, that mere awareness on the part of the manufacturer that the product had entered into the stream of commerce was not an act of the manufacturer "purposefully directed toward the forum state." [4] *Id.* at 112, 107 S.Ct. at 1031. However, four members of the Court, led by Justice Brennen, determined that the defendant had satisfied the minimum contacts test found in *International Shoe* because it put goods in the stream of commerce that the defendant knew would lead into the forum state.

In his concurrence, Justice Brennan stated that the requirement in Part II–A of some additional conduct aimed at the forum state is inconsistent with *World–Wide Volkswagen* and unnecessary:

The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State. Accordingly, most courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct.

*Id.* at 117, 107 S.Ct. at 1034–35.

Under the particular facts of *Asahi,* a majority of the Court found that exercise of personal jurisdiction by California over the foreign corporation was unreasonable and unfair, and violated the Due Process

---

from the jurisdiction of this court by use of an exclusive distributor.

*Id.* at 136. The court then dismissed the defendant's motion to dismiss for lack of personal jurisdiction.

*See also Warren v. Honda Motor Co., Ltd.,* 669 F.Supp. 365 (D.Utah 1987); *Welkener v. Kirkwood Drug Store Co.,* 734 S.W.2d 233 (Mo.App. 1987); *Wessinger v. Vetter Corp.,* 685 F.Supp. 769 (D.Kan.1987).

**4.** In Part II–A, four justices concurred that "[t]he 'substantial connection,' (citations omitted) between the defendant and the forum State necessary for a finding of minimum contacts

must come about by an action of the defendant purposefully directed towards the forum State.... The placement of a product into the stream of commerce, without more, is not an act directed toward the forum State." *Id.,* 480 U.S. at 112, 107 S.Ct. at 1031. In order to show an intent to direct the products towards the forum State, the Court lists specific examples: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

Clause of the Fourteenth Amendment. *Id.* at 116, 107 S.Ct. at 1034. In making the decision, the Court looked to the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. Specifically, the Court found that California had virtually no interest in the maintenance of an indemnity action between Japanese and Taiwanese corporations, the only parties left in the lawsuit at that point, and that the burden on the Japanese company was severe. The Court also noted that the plaintiff's interest was slight at best, since he had settled the suit out of court and all that remained was an action between the two foreign codefendants. Finally, the Supreme Court found that *Asahi* "did not create, control or employ the distribution system that brought its valves to California," since it sold its valves in Taiwan rather than in the United States. *Id.* at 112, 107 S.Ct. at 1032.

■ The facts in the case now before us are different from those found in *Asahi.* In *Asahi,* the Japanese valve manufacturer corporation was a separate entity from the Taiwanese company, which purchased the valves and then sold the completed tires in the United States. No evidence was presented which would connect the two foreign corporations. In this case, SDA is a wholly-owned subsidiary of SDK, with SDK ordering SDA when to stop selling the defective product. Based upon the reasoning found in *World–Wide Volkswagen* and *Asahi,* our next step is to determine what burdens are placed on SDK by exercising personal jurisdiction, and on the plaintiff by refusing to exercise jurisdiction over SDK. We also must analyze the plaintiff's interest in obtaining speedy and convenient relief, the shared interests of the states in furthering fundamental social policies, and what interests exist on the part of the forum state—West Virginia—in West Virginia's exercise of jurisdiction over SDK.

West Virginia's long-arm statute authorizes the exercise of personal jurisdiction where a foreign corporation sells, offers for sale, or supplies a defective product within the state which causes injury in West Virginia. Specifically, W.Va.Code § 31-1-15 (1988) provides, in part:

> For the purpose of this section, a foreign corporation not authorized to conduct affairs or transact business in this State pursuant to the provisions of this article shall nevertheless be deemed to be conducting affairs or doing or transacting business herein ... (c) if such a corporation manufactures, sells, offers for sale or supplies any product in a defective condition and such product causes injury to any person or property within the State notwithstanding the fact that such corporation has no agents, servants, or employees or contacts within this State at the time of said injury.[5]

■ Although W.Va.Code § 31-1-15 permits the exercise of jurisdiction over a nonresident, a certain amount of minimum contacts with West Virginia is required to avoid violation of constitutional restraints found in *World–Wide Volkswagen Corp. v. Woodson, supra.* "The standard of jurisdictional due process is that a foreign corporation must have such minimum contacts with the state of the forum that the maintenance of an action in the forum does not offend traditional notions of fair play and substantial justice." Syllabus Point 1, *Hodge v. Sands Manufacturing Company,* 151 W.Va. 133, 150 S.E.2d 793 (1966). In *Kidwell v. Westinghouse Electric Co.,* 178 W.Va. 161, 358 S.E.2d 420 (1986), this Court emphasized that:

> W.Va.Code, 31-1-15 ... includes in the concept of doing business, the making of a contract, the committing of a tort, in whole or in part, in this State, or the selling of a defective product in this State. We do not believe that after *World–Wide Volkswagen* such an exclusive test can be relied upon to constitute doing business sufficient for *in personam* jurisdiction. As we emphasized in *City of Fairmont,* the test must look to the minimum contacts standard.

*Id.,* 358 S.E.2d at 422. *See also Harman v. Pauley,* 522 F.Supp. 1130, 1135

---

5. Subsection (c) is an addition to the statute enacted by the Legislature in 1969.

(S.D.W.Va.1981); *S.R. v. City of Fairmont,* 167 W.Va. 880, 280 S.E.2d 712 (1981).

A second long-arm statute, W.Va.Code § 56–3–33(a)(4) (1992), permits the exercise of personal jurisdiction within the following parameters:

> (4) Causing tortious injury in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State;

■ The federal court for the Northern District of West Virginia analyzed W.Va. Code § 56–3–33(a)(4) in *Hinzman v. Superior Toyota, Inc.,* 660 F.Supp. 401 (N.D.W.Va.1987). The court divided W.Va. Code § 56–3–33(a)(4) into two basic requirements necessary to exercise jurisdiction: (1) a tortious injury in West Virginia that is caused by an out of state act or omission, and (2) a relationship between the defendant and West Virginia exists in any of the three manners specified in subsection (4). *Id.* at 402. Thus, if the company regularly does or solicits business in West Virginia, engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed in West Virginia, then personal jurisdiction would extend out of West Virginia. The appellees, of course, argue that SDK has no relationship with West Virginia based on either W.Va.Code §§ 31–1–15 or 56–3–33(a)(4). We disagree.[6]

This Court declined to exercise personal jurisdiction in two prior cases involving out-of-state defendants. *Hodge v. Sands Manufacturing Co.,* 151 W.Va. 133, 150 S.E.2d 793, 800 (1966), involved a foreign corporation which manufactured component parts of hot water heaters which were eventually shipped into and sold in West Virginia. The Court held that local courts could not exercise personal jurisdiction over a foreign defendant that was not authorized to do business in the State and had no representatives in the State, had not maintained a place of business in the State, had not entered into any contracts to be performed by any party to such contracts within the State, did not own property within the State, and had not appointed anyone to accept process within the State. Similarly, in *Chase v. Greyhound Lines, Inc.,* 158 W.Va. 382, 211 S.E.2d 273 (1975), the Court ruled that a West Virginia court could not exercise personal jurisdiction over an out-of-state defendant where that defendant was not licensed to do business in the State, made no contracts to be performed in whole or in part in the State, was not doing business in the State, committed no tort in the State, had no employees or agents in the State, owned no property within the State, had not manufactured, sold, offered for sale, or supplied a product causing injury within the State, did not appoint anyone to accept process in the State, and had contact only in that its product entered the State as a component of another's product.

Contrary to SDK's argument, the facts in this case are distinct from *Hodge* and *Chase.* In *Hodge,* the Court ruled that "the determination of the existence of minimum contacts essential to confer jurisdiction upon a court of the state of the forum depends upon the specific facts of each particular case. . . ." *Id.,* 150 S.E.2d at 802. Unlike this case, *Hodge* did not involve an establishment of a distribution system for its product through the mechanism of a wholly owned subsidiary. The use of the wholly owned subsidiary enabled SDK to run all their United States distribution of L-tryptophan through that company. Further, SDK admitted that once they realized the problem with the L-tryptophan, they ordered SDA to halt distribution. We fail to see how much more control SDK could have over SDA.

---

6. In *Showa Denko K.K. v. Pangle,* 202 Ga.App. 245, 414 S.E.2d 658 (1991), *cert. denied* (1992), the Georgia court affirmed the trial court's denial of SDK's motion to dismiss for lack of personal jurisdiction. In *Pangle,* the Georgia court found that SDK was subject to the Georgia long-arm jurisdiction based upon the tortious acts of its agent and that the exercise of personal jurisdiction did not offend due process. *Id.,* 414 S.E.2d at 660–61.

Like the federal district court's analysis of W.Va.Code § 56–3–33(a)(4) in *Hinzman,* we note that SDK derived substantial revenue from the L-tryptophan purchased and used in West Virginia. Although SDK denied that it solicited business in West Virginia, SDA clearly did. Further, under the analysis set forth in *World–Wide Volkswagen* and affirmed in *Asahi,* we determine that West Virginia has a substantial and legitimate interest in exercising personal jurisdiction over SDK, the company that manufactured and sold the contaminated L-tryptophan. Likewise, the burden on the plaintiff would be substantial since SDK, rather than SDA, has the information related to the manufacturing process. SDK's assertions that this need on the part of the plaintiff could be satisfied by open communication between SDA and SDK merely reinforces our conviction that the true authority in this relationship is SDK, not the shell corporation, SDA. The burden of SDK submitting to jurisdiction in the United States and West Virginia would be minimal since SDK has already gone through the effort of setting up SDA in the United States. They have obviously found doing business in the United States to be profitable enough to create SDA. We fail to see how defending these suits in the United States would be a greater burden. By contrast, requiring the plaintiff to travel to Japan to litigate this case would create a substantial burden. Consequently, we conclude that "notions of fair play and substantial justice" require us to exercise personal jurisdiction over SDK. *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158.

Moreover, under Justice Brennan's analysis in *Asahi, supra,* SDK benefitted from its contacts with West Virginia regardless of whether it directly conducts business in or directed toward West Virginia. We conclude that personal jurisdiction "premised on the placement of a product into the Stream of Commerce is consistent with the Due Process Clause," and can be exercised without the need to show additional conduct by the defendant aimed at the forum state. *Asahi,* 480 U.S. at 117, 107 S.Ct. at 1034. Given the distribution pattern of the product, this and the many other lawsuits filed as a result of the use of the contaminated L-tryptophan cannot come as a surprise. Accordingly, we reverse the decision of the Circuit Court of Kanawha County and hold that SDK is subject to the long arm jurisdiction of West Virginia and the United States Supreme Court's decisions in *International Shoe, World–Wide Volkswagen,* and *Asahi.*

Reversed.