728 S.E.2d 74

**Craig A. GRIFFITH, West Virginia State Tax Commissioner, Respondent Below, Petitioner**

v.

**CONAGRA BRANDS, INC., Petitioner Below, Respondent.**

No. 11–0252.

Supreme Court of Appeals of West Virginia.

Submitted April 18, 2012.

Decided May 24, 2012.

Concurring Opinion of Justice Benjamin May 30, 2012.

Darrell V. McGraw, Jr., Attorney General, Katherine A. Schultz, Senior Deputy Attorney General, Charli Fulton, Senior Assistant Attorney General, Charleston, WV, for Petitioner, West Virginia State Tax Commissioner.

Michael E. Caryl, Esq., Floyd M. Sayre, III, Esq., Bowles Rice McDavid Graff & Love, Martinsburg, WV, for Respondent, ConAgra Brands, Inc.

KETCHUM, C.J.

This case is before this Court upon the appeal of the West Virginia State Tax Commissioner from the final order of the Circuit Court of Berkeley County which set aside the decision of the West Virginia Office of Tax Appeals. The Office of Tax Appeals rejected the challenge of ConAgra Brands, Inc. ("ConAgra Brands") to assessments for unpaid corporation net income tax and business franchise tax. The assessments were imposed on apportioned royalties ConAgra Brands received from the licensing of its intangible trademarks and trade names for use throughout the United States, including West Virginia. In setting aside the decision of the Office of Tax Appeals, the circuit court held that ConAgra Brands' licensing transactions did not constitute doing business in West Virginia and that the assessments failed to meet the requirements of the Due Process and Commerce Clauses of the Constitution of the United States.[1]

---

1. *See*, U.S. Const. amend. XIV, § 1 (No State shall "deprive any person of life, liberty, or prop-

The State Tax Commissioner seeks reinstatement of the assessments for corporation net income tax and business franchise tax.

This Court has carefully reviewed the record-appendix, the briefs and argument of the parties and the law relevant to this matter and is of the opinion that the order setting aside the decision of the Office of Tax Appeals and invalidating the assessments should not be disturbed. Accordingly, the final order of the Circuit Court of Berkeley County is affirmed.

## I.

## Factual Background

The principal facts are not in dispute and may be summarized from the stipulations of the parties and the adjudicated findings below as follows:

ConAgra Foods, Inc., ("CA Foods") and its affiliates owned a large number of trademarks and trade names in the food products industry. In 1997, CA Foods established ConAgra Brands for the purpose of centralizing the management and protection of its trademark and trade name portfolio. ConAgra Brands, a Nebraska corporation, was a wholly-owned subsidiary of CA Foods.

CA Foods and its affiliates transferred the trademarks and trade names to ConAgra Brands and agreed, through license agreements, to pay royalties to ConAgra Brands for the use of the trademarks and trade names. ConAgra Brands acquired additional trademarks and trade names from unrelated entities.

Through the execution of licensing agreements, ConAgra Brands began collecting royalty payments for the use of its trademarks and trade names by various unrelated, third party licensees and CA Foods affiliated licensees. The trademarks and trade names, to name but a few, included familiar brands, such as Armour, Butterball, Country Skillet,

Healthy Choice, Kid Cuisine, Morton, Swift and Swift Premium. The royalties were collected by ConAgra Brands from the sale by the licensees of food products bearing the trademarks and trade names to clients and customers throughout the United States, including West Virginia.[2]

Items bearing ConAgra Brands' trademarks and trade names were found in many, if not in most, retail grocery stores in this State. As subsequently observed by the West Virginia Office of Tax Appeals, the items included "prepared poultry, such as turkey and chicken, processed and smoked meats, breads, pastas, canned food, boxed processed dishes, frozen food, jarred food, sandwich spreads, pre-packaged meals, entrees and side dishes, dairy products, desserts, condiments and canned, bottled and frozen drinks." ConAgra Brands did not manufacture or sell the products. All products in question were manufactured by the licensees in facilities outside West Virginia. As the circuit court determined, ConAgra Brands conducted its business of licensing and protecting the value of its trademarks and trade names entirely outside of this State.

ConAgra Brands did not own or rent any offices, warehouses or other facilities in West Virginia and did not maintain any inventory or sell or distribute merchandise in this State. ConAgra Brands had no employees or agents in West Virginia. Various licensees sold or distributed products bearing the trademarks and trade names to wholesalers and retailers located in West Virginia, and the licensees provided services in West Virginia to those clients and customers. ConAgra Brands provided no services in that regard and, *as stipulated*, did not direct or dictate how the licensees distributed the products bearing the trademarks and trade names. Nevertheless, ConAgra Brands paid all expenses in defending its trademarks and trade

erty without due process of law.") and U.S. Const. art. 1, § 8, cl. 3 (Congress shall have the power to "regulate Commerce with foreign Nations, and among the several States.")

**2.** In one license agreement, for example, ConAgra Brands granted Hunt–Wesson, Inc., a nonexclusive right to use certain trademarks, including the trademark Healthy Choice, in connection with the development, manufacture, promotion, distribution, marketing and sale of various food products. The agreement provided that Hunt–Wesson, Inc., would make royalty payments to ConAgra Brands for the use of the trademarks.

names against infringement and in overseeing national marketing by developing marketing strategies and purchasing advertisements with national media outlets.

During the audit period, ConAgra Brands obtained substantial royalties related to product sales in West Virginia. As subsequently confirmed by the Office of Tax Appeals, four principal licensees made between $19,269,000 and $46,247,000 in sales in West Virginia of ConAgra Brand trademarked or trade named products. Those sales earned royalties for ConAgra Brands during the audit period of approximately $1,156,000.[3]

## II.

### Procedural Background

Following a field audit, which included a Multistate Tax Commission Audit Report, the Director of the Auditing Division of the State Tax Division, in July 2006, issued a notice of assessment for the period June 1, 2000, through May 31, 2003, stating that ConAgra Brands failed to pay corporation net income tax on income apportioned to West Virginia. The amount of the assessment was $44,012.00 in tax plus $16,789.00 in interest for a total assessed liability of $60,801.00. At that time, corporation net income tax was imposed in this State pursuant to *W.Va.Code*, 11–24–1 [1967] *et seq.*[4] Also in July 2006, the Director issued a notice of assessment for the same audit period stating that ConAgra Brands failed to pay business franchise tax as apportioned to West Virginia. The amount of the assessment was $12,501.00 in tax plus $4,541.00 in interest for a total assessed liability of $17,042. Business franchise tax is imposed

in this State pursuant to *W.Va.Code*, 11–23–1 [1985] *et seq.* In both assessments, interest was computed through August 2006.

ConAgra Brands filed petitions for reassessment alleging that it was subject to neither corporation net income tax nor business franchise tax in West Virginia. In March 2009, an evidentiary hearing on the petitions was conducted before the Office of Tax Appeals followed by the submission of briefs.[5]

By decision dated January 6, 2010, the Office of Tax Appeals upheld the two assessments.

The Office of Tax Appeals concluded that the corporation net income tax and business franchise tax assessments were consistent with the requirements of Due Process since, during the audit period, ConAgra Brands had minimum contacts with West Virginia, and the royalty income attributed to West Virginia for tax purposes was rationally related to benefits provided by this State. The decision stated: "The Petitioner [ConAgra Brands] receives royalty payments from the licensees, primarily based on the amount of sales. Thus, it benefits from the sale of its licensed products in the State of West Virginia. Therefore, the Petitioner has availed itself of the economic forum of the State of West Virginia."

In addition, the Office of Tax Appeals concluded that neither assessment violated the Commerce Clause since: (1) ConAgra Brands had a substantial nexus with West Virginia, (2) the taxes as assessed were fairly apportioned, (3) the taxes did not discriminate against interstate commerce and (4) the taxes were fairly related to the benefits provided to ConAgra Brands by this State. The

---

**3.** It should be noted that ConAgra Brands has ceased doing business and no longer exists. The trademarks and trade names it owned were transferred to ConAgra Foods RDM [research, development and marketing], Inc., an entity with additional functions beyond those exercised by ConAgra Brands.

**4.** Statutory citations in this opinion will relate to the time periods under discussion. Some statutes remain in effect without change, and others have been amended. In the latter case, subsequent amendments are not relevant.

**5.** Article 10A of chapter 11 on state taxation concerns the West Virginia Office of Tax Ap-

peals. Pursuant to *W.Va.Code*, 11–10A–10(b) [2002], hearings before the Office of Tax Appeals (to be heard *de novo*) shall be conducted pursuant to the contested cases procedure set forth in *W.Va.Code*, 29A–5–1 [1964] *et seq.*, of the State Administrative Procedures Act, to the extent not inconsistent with the provisions of article 10A. Pursuant to *W.Va.Code*, 11–10A–10(c) [2002], the Office of Tax Appeals "is not bound by the rules of evidence as applied in civil cases in the circuit courts of this State." *See,* C.S.R. § 121–1–1 [2003] *et seq.*, concerning rules of practice and procedure before the Office of Tax Appeals.

decision stated in reference to the Commerce Clause:

> The Petitioner not only knows that its licensees will penetrate the economic markets of various states, it expects it and readily accepts the benefit therefrom. As described herein, the rights and benefits owned by the Petitioner in its trademarks and trade names are inseparable from the rights and duties of its licensees. * * * [The audit] figures demonstrate the frequency, quantity and systematic nature of [ConAgra Brands'] contacts with West Virginia. * * * Advertising in all of its forms demonstrates all of these factors. The presence of its licensees demonstrates the systematic nature of its contacts with the State. That the Petitioner has a "substantial economic presence" in the State of West Virginia is beyond question.

ConAgra Brands filed an appeal in the Circuit Court of Berkeley County from the decision of the Office of Tax Appeals.[6] Additional briefs were submitted, and on January 10, 2011, the circuit court entered a final order setting aside the decision of the Office of Tax Appeals. Concluding that ConAgra Brands was not doing business in West Virginia during the audit period for purposes of either the corporation net income tax or the business franchise tax, the Circuit Court stated:

> As to the products, bearing labels imprinted with the trademarks and trade names licensed by ConAgra Brands to its licensees, when in West Virginia, either in the hands of those licensees, or the licensees' retailer customers, neither the third-party suppliers of ingredients to the licensees for the products, nor the third-party suppliers of those labels, nor ConAgra

Brands, Inc., have, purely by virtue of supplying those ingredients or labels, or licensing the use of those trademarks and trade names, the minimum, much less the substantial connection, with West Virginia to satisfy either the Due Process or Commerce Clauses or, thus, to allow West Virginia to impose its [corporation net income tax and/or business franchise tax] on them.

In so holding, the circuit court further stated:

> All manufacturing processes, utilized by the licensees to produce and to ensure the quality and taste of the finished products, occurred at the licensees' manufacturing facilities located outside of West Virginia, and the licensees did not operate retail stores in West Virginia.

> ConAgra Brands, Inc., reported and paid income tax to states in which it owned or rented property, provided services or made sales to customers through its employees or agents.

The State Tax Commissioner appeals to this Court from the January 10, 2011, order of the circuit court.

### III.

### Standards of Review

In syllabus point 3 of *Frymier-Halloran v. Paige, Comm'r*, 193 W.Va. 687, 458 S.E.2d 780 (1995), this Court held that the standard of review applicable to decisions of the State Tax Commissioner are the same as those set out in the State Administrative Procedures Act. *See, Kanawha Eagle Coal v. Tax Comm'r*, 216 W.Va. 616, 619, 609 S.E.2d 877, 880 (2004) (indicating that, in appeals

---

6. An appeal to circuit court from the Office of Tax Appeals is provided by *W.Va.Code*, 11–10A–19(a) [2002]. Subsection (f) of that statute states that the circuit court shall hear the appeal as provided in *W.Va.Code*, 29A–5–4, of the State Administrative Procedures Act. *See*, C.S.R. § 121–1–85.1 and 85.3.1 [2003]. As *W.Va.Code*, 29A–5–4(g) [1998], provides:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the adminis-

trative findings, inferences, conclusions, decision or order are:
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedures; or
> (4) Affected by other error of law; or
> (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

from tax assessments, review by a circuit court, and subsequently by this Court, is governed by the provisions of *W.Va.Code*, 29A–5–4 [1998] ). As a component of that standard, findings of fact by the administrative law judge are accorded deference, unless the reviewing court concludes the findings to be clearly wrong. Moreover, questions of law are reviewed *de novo. See, Hartley Marine Corporation v. Mierke, Comm'r,* 196 W.Va. 669, 677, 474 S.E.2d 599, 607 (1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 832 (1997) (The determination of whether state legislation violates the Commerce Clause is reviewed *de novo* ); *Appalachian Power Company v. State Tax Dept.,* 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995) (indicating that, even where review is *de novo,* interpretation based on administrative expertise and discretion should be examined).

■ Those standards of review should apply to the final order of a circuit court concerning an appeal from the Office of Tax Appeals as well as a final order of a circuit court concerning an appeal from the State Tax Commissioner. In this case, review of the validity of the assessments against ConAgra was subject to the State Administrative Procedures Act, with the *de novo* element, at both the Office of Tax Appeals and circuit court levels. *See,* n. 5 and n. 6, *supra.* It follows, therefore, and this Court holds that, in an administrative appeal from the decision of the West Virginia Office of Tax Appeals, this Court will review the final order of the circuit court pursuant to the standards of review in the State Administrative Procedures Act set forth in *W.Va.Code,* 29A–5–4(g) [1988]. Findings of fact of the administrative law judge will not be set aside or vacated unless clearly wrong, and, although administrative interpretation of State tax provisions will be afforded sound consideration, this Court will review questions of law *de novo.*

### IV.

### Discussion

During the audit period, corporation net income tax was imposed in this State pursuant to *W.Va.Code,* 11–24–1 [1967] *et seq.* As provided in *W.Va.Code,* 11–24–4(3) [1988], the tax was imposed "on the West Virginia taxable income of every domestic or foreign corporation engaging in business in this state or deriving income from property, activity or other sources in this state[.]" The phrase *engaging in business* was defined, generally, in *W.Va.Code,* 11–24–3a(7) [1991], as follows: "The term 'engaging in business' or 'doing business' means any activity of a corporation which enjoys the benefits and protection of government and laws in this state."

Business franchise tax during the audit period was imposed in this State pursuant to *W.Va.Code,* 11–23–1 [1985] *et seq.* As provided in *W.Va.Code,* 11–23–6(a) [1996], a business franchise tax was imposed "on the privilege of doing business in this state and in respect of the benefits and protection conferred. Such tax shall be collected from ... every foreign or domestic corporation owning or leasing real or tangible personal property located in this state or doing business in this state[.]" In the context of business franchise tax, the phrase *doing business* was defined, generally, in *W.Va.Code,* 11–23–3(b)(8) [1991], as "any activity of a corporation or partnership which enjoys the benefits and protection of the government and laws of this state[.]" *See,* CSR § 110–23–3.10 [1992] (similar definition).

As to both this State's corporation net income tax and business franchise tax, the phrase *business income* was defined as meaning:

income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property or the rendering of services in connection therewith constitute integral parts of the taxpayer's regular trade or business operations.

*W.Va.Code,* 11–24–3a(1) [1991]; *W.Va.Code,* 11–23–3(b)(1) [1991]. *See,* CSR § 110–23–3.3 [1992] (similar definition). Moreover, as to both types of tax, the phrase *income-producing activity,* under the respective apportionment provisions, was defined as including the "sale, licensing or other use of intangible personal property." *W.Va.Code,* 11–24–

7(f)(4) [1998]; *W.Va.Code*, 11–23–5(n)(4) [1991].[7]

The circuit court concluded that ConAgra Brands had not done business in West Virginia during the audit period for purposes of the corporation net income tax or the business franchise tax. In invalidating the assessments, the circuit court described the various entities involved in the licensees' manufacturing process. The circuit court underscored its conclusion that neither the supplying of ingredients or labels by third-parties for the products, nor the licensing by ConAgra Brands of the trademarks and trade names, had any association with West Virginia sufficient to impose the assessments on ConAgra Brands. As the circuit court pointed out, all manufacturing processes conducted by the licensees occurred at facilities outside of West Virginia. None of the licensees operated any retail stores in West Virginia. Thus, the circuit court determined, *a fortiori*, that ConAgra Brands had neither the minimum contacts with this State required under the Due Process Clause, nor the substantial nexus required under the Commerce Clause, to warrant the assessments.

The State Tax Commissioner asserts, however, that since various licensees made between $19 million and $46 million in sales in West Virginia, and ConAgra Brands earned over $1 million in royalties, those business entities, no doubt, worked in concert during the audit period toward a common economic goal. By way of consumer recognition, the trademarks and trade names were as important to sales as the quality of the product itself. Moreover, ConAgra Brands retained an interest in the quality of the products through the license agreements. Consequently, the trademarks and trade names produced income in West Virginia, thereby subjecting ConAgra Brands to corporation net income and business franchise tax, and whether ConAgra Brands had a "physical presence" in this State is irrelevant. According to the State Tax Commissioner, ConAgra Brands, thus, purposefully directed its intangible assets toward West Virginia, thereby

satisfying the minimum contacts standard of the Due Process Clause, and established a significant economic presence in this State, thus satisfying the substantial nexus component pertaining to the Commerce Clause. As a result, the Commissioner seeks reinstatement of the assessments.

■ In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Supreme Court of the United States confirmed that interstate commerce is not immune from state taxation. As the Court indicated, however, that principle is subject to various limitations. In syllabus point 1 of *Western Maryland Railway Co. v. Goodwin, Comm'r*, 167 W.Va. 804, 282 S.E.2d 240 (1981), this Court confirmed: "A state tax on interstate commerce will not be sustained unless it: '(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate; and (4) is fairly related to the services provided by the State.' *Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576, 600 (1981)." *In accord, Hartley Marine Corporation, supra*, 196 W.Va. at 677, 474 S.E.2d at 607.

Subsequently, in *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), the Supreme Court of the United States distinguished Due Process from Commerce Clause concerns with regard to state taxation of foreign corporations as follows:

Due Process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him. We have, therefore, often identified "notice" or "fair warning" as the analytic touchstone of due process nexus analysis. In contrast, the Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of

---

**7.** Currently, the phrase *intangible property* is defined in *W.Va.Code*, 11–24–3a(a)(19) [2009], as including trademarks, trade names and similar types of assets.

state regulation on the national economy. * * *

The *Complete Auto* analysis reflects these concerns about the national economy. The second and third parts of that analysis, which require fair apportionment and non-discrimination, prohibit taxes that pass an unfair share of the tax burden onto interstate commerce. The first and fourth prongs, which require a substantial nexus and a relationship between the tax and state-provided services, limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. Thus, the "substantial nexus" requirement is not, like due process' "minimum contacts" requirement, a proxy for notice, but rather a means for limiting burdens on interstate commerce. Accordingly, contrary to the State's suggestion, *a corporation may have the "minimum contacts" with a taxing State as required by the Due Process Clause, and yet lack the "substantial nexus" with that State as required by the Commerce Clause.*

504 U.S. at 312, 313, 112 S.Ct. at 1913–14, 119 L.Ed.2d at 106, 107. (emphasis added)

Of particular importance in the current matter is this Court's decision in *Tax Comm'r v. MBNA America Bank,* 220 W.Va. 163, 640 S.E.2d 226 (2006), *cert. denied,* 551 U.S. 1141, 127 S.Ct. 2997, 168 L.Ed.2d 719 (2007).[8] In *MBNA,* the taxpayer, a Delaware corporation in the business of issuing and servicing VISA and MasterCard credit cards, sought refunds from the West Virginia State Tax Commissioner for corporation net income and business franchise taxes it paid for the years 1998 and 1999. Although the taxpayer promoted its business to West Virginia customers via mail and telephone solicitation, it had no employees or property in this State. The sole issue in *MBNA* was whether the imposition of the taxes, on a foreign corporate taxpayer with no physical presence in West Virginia, violated the Commerce Clause. Finding that the taxpayer, nevertheless, had a substantial nexus with this State during the audit period, the Circuit

Court of Kanawha County upheld the taxes. Upon appeal, this Court affirmed.

■ As the Supreme Court of the United States did in *Quill,* this Court, in *MBNA,* distinguished the Due Process analysis concerning state taxation from an analysis under the Commerce Clause. The opinion confirmed that, whereas a Due Process analysis involves the requirement of some minimum connection between the state and the activity sought to be taxed, coupled with traditional notions of fairness, an analysis of the validity of a state tax under the Commerce Clause is more concerned with whether a state-imposed tax unduly burdens interstate commerce or affects the national economy. Moreover, in considering the type of "substantial nexus" required under *Complete Auto* and *Maryland v. Louisiana,* as a component of a Commerce Clause analysis, this Court determined that a "significant economic presence" test would be an appropriate measure. The opinion in *MBNA* explains:

> Rather than a physical presence standard, this Court believes that a significant economic presence test is a better indicator of whether substantial nexus exists for Commerce Clause purposes. At least one legal commentator has suggested such a test and to some degree defined its parameters. *See* Edson, 49 Tax Lawyer at 943. According to this commentator, a substantial economic presence standard "incorporates due process 'purposeful direction' towards a state while examining the degree to which a company has exploited a local market." *Id.* Further, "[a] substantial economic presence analysis involves an examination of both the quality and quantity of the company's economic presence." *Id.,* 49 Tax Law. at 944. Finally, under this test, "[p]urposeful direction towards a state is analyzed as it is for Due Process Clause purposes," and the Commerce Clause analysis requires the additional examination of "the frequency, quantity and systematic nature of a taxpayer's economic contacts

8. This Court filed the opinion in *MBNA* in November 2006 subsequent to the issuance of the assessments for corporation net income and business franchise tax against ConAgra Brands.

Nevertheless, *MBNA* was addressed below by the parties, the Office of Tax Appeals and the circuit court.

with a state." *Id.*, 49 Tax Law. at 945. We find this rationale persuasive and will apply it in determining the constitutionality of the taxes at issue.

220 W.Va. at 171, 640 S.E.2d at 234.

Upholding the corporation net income and business franchise taxes, this Court concluded, in *MBNA,* that physical presence in West Virginia was not a requirement, for Commerce Clause purposes, in the circumstances pertaining to the taxpayer.[9] This Court noted, however, that the record demonstrated that *"MBNA* continuously and systematically engaged in direct mail and telephone solicitation and promotion in West Virginia." 220 W.Va. at 172, 640 S.E.2d at 235.

In the current matter, ConAgra Brands did not engage in the solicitation noted in *MBNA.*[10] In contrast, while physical presence in this State is not a requirement concerning the validity of the two assessments, it is worth drawing attention to the many joint stipulations in this case favorable to the taxpayer, i.e., ConAgra Brands did not own or rent any offices, warehouses or other facilities in West Virginia and did not maintain any inventory or sell or distribute merchandise in this State. ConAgra Brands had no employees or agents in West Virginia. The licensees, rather than ConAgra Brands, sold or distributed the products bearing the trademarks and trade names to wholesalers and retailers located in West Virginia, and the licensees provided services in West Virginia to those clients and customers. ConAgra Brands provided no services in that regard *and did not direct or dictate how the licensees distributed the products bearing the trademarks and trade names.* Nevertheless, ConAgra Brands paid all expenses in defending its trademarks and trade names against infringement and in overseeing national marketing by developing marketing strategies and purchasing advertisements with national media outlets. With regard to defending against infringement, the final order of the circuit court stated in part:

> Even if arising, entirely or in part, from conduct occurring in West Virginia, actions to protect ConAgra Brands, Inc.'s rights in its trademarks and trade names would be brought exclusively in the courts of the United States under the provisions of the laws of the United States protecting such intellectual property.

ConAgra Brands asserts as follows:

> The Respondent [ConAgra Brands] conducts its business of licensing and protecting the value of its trademarks and trade names entirely outside of West Virginia. * * * None of the licensees have retail stores in West Virginia. Instead, they sell their products to wholesalers and distributors who, in turn, sell those products to retailers in various states throughout the United States, including West Virginia.

A further matter of controversy in this case is whether the placement of the trademarks and trade names by ConAgra Brands in the "stream of commerce" through the licensees' products was sufficient to warrant the tax assessments imposed on ConAgra Brands in West Virginia. An element of confusion, however, surrounds the lack of consensus within the leading case on that point: *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). ConAgra Brands relies on the opinion of Justice O'Connor, in *Asahi,* which states in part: "The placement of a product into the stream of commerce, without more, is not an act of

---

9. Recognizing other forms of state taxation, this Court indicated in syllabus point 2 of *MBNA* that an entity's physical presence, required to meet the "substantial nexus" prong of *Complete Auto,* applies only to "state sales and use taxes" and not to corporation net income and business franchise taxes. Syl. pt. 2, *MBNA,* in part.

10. The brief filed by ConAgra Brands in this Court states:

> That the Respondent [ConAgra Brands] earned its income by charging royalties to licensee / manufacturers for the use of its intangible personal property, while the taxpayer in *MBNA* earned its income by charging interest and service fees to retail customers for the use of money, hardly makes their business comparable for any purpose. Moreover, what is most meaningful to the issue of their respective taxability here is that *none* of the parties with which the Respondent [ConAgra Brands] conducts its business were in West Virginia, while *all* of the customers, with which MBNA conducted its taxable business here, were in West Virginia. (emphasis in original)

the defendant purposefully directed toward the forum State." 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104. On the other hand, citing *Asahi*, this Court held in syllabus point 2 of *Hill v. Showa Denko, K.K.*, 188 W.Va. 654, 425 S.E.2d 609 (1992), *cert. denied*, 508 U.S. 908, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993):

> Personal jurisdiction "premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause" and can be exercised without the need to show additional conduct by the defendant aimed at the forum state. *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 117, 107 S.Ct. 1026 [1035], 94 L.Ed.2d 92 [108] (1987).

The principle thus set forth in *Hill* was based upon the separate opinion of Justice Brennan in *Asahi*.[11] The remaining Justices were split, with some variation, between the opinions of Justices O'Connor and Brennan.

In any event, *Hill* concerned the question of whether the exercise of personal jurisdiction in West Virginia over a drug manufacturer located in Japan satisfied the requirements of Due Process where one of the manufacturer's over-the-counter medications was allegedly contaminated and injured the plaintiff. Following Justice Brennan's opinion in *Asahi*, this Court, in *Hill*, found jurisdiction in West Virginia to be proper since the Japanese manufacturer derived substantial revenue in West Virginia from the purchase of its medications in this State. Important to the decision in *Hill*, however, was the fact that the manufacturer's sole American distributor was its wholly owned subsidiary. Referring to the subsidiary as a "shell corporation," this Court noted that the man-

ufacturer was able to run all distribution of its product in the United States through its subsidiary and that the manufacturer had the authority to direct the subsidiary to halt the distribution. 188 W.Va. at 660, 661, 425 S.E.2d at 615, 616.

The record in this case, however, demonstrates that ConAgra Brands was not a shell corporation created solely for tax avoidance purposes. It is undisputed that, prior to the creation of ConAgra Brands, CA Foods and its affiliates experienced inconsistent, disjointed and inefficient trademark management which made it difficult to maintain and protect a uniform brand image. Thus, as both the Office of Tax Appeals and the circuit court determined: "ConAgra Brands, Inc., was created to centrally manage and provide for uniformity in brand image and brand presentation for the highly valued trademarks and trade names used by ConAgra Foods, Inc., and its subsidiaries."[12] Moreover, it is also undisputed that, in addition to executing agreements with CA Foods and its affiliates, ConAgra Brands acquired trademarks and trade names from unrelated entities and, through licensing agreements, earned royalty payments from unrelated entities. Consequently, the two assessments cannot be upheld upon the allegation that ConAgra Brands was a shell corporation.

The case decisions from other jurisdictions cited by the State Tax Commissioner are not dispositive. Although many of those cases suggest that the assessments in the matter now to be determined would be upheld, the narrative momentum of those authorities is mitigated by the circumstantial detail. In *Geoffrey, Inc. v. South Carolina Tax Com-*

---

**11.** In his separate opinion, in *Asahi*, Justice Brennan stated:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

480 U.S. at 117, 107 S.Ct. at 1034, 94 L.Ed.2d at 107.

**12.** ConAgra Brands stated before the Office of Tax Appeals:

> Without the formation of the new legal entity, the proper management of the various trade names and trademarks would have been managed separately by the affiliates resulting in differences and duplication (or multiplication) of many procedures. It was highly efficient and effective to have all the control functions from across the independent operating companies placed in a single entity. ConAgra should not be penalized for managing their trade names and trademarks in the most efficient manner.

*mission,* 313 S.C. 15, 437 S.E.2d 13, *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993), the Supreme Court of South Carolina held that a tax on a foreign corporation's apportioned income from royalty payments violated neither the Due Process Clause nor the Commerce Clause. Geoffrey, Inc., a Delaware corporation, was a wholly-owned subsidiary of the Toys R Us company. Geoffrey licensed to the Toys R Us company the trade name "Toys R Us," plus Geoffrey's "merchandising skill, techniques, and 'know-how' in connection with marketing, promotion, advertising, and sale of products[.]" 437 S.E.2d at 15. The license agreement covered a number of states, and, although Geoffrey, Inc., had no physical presence in South Carolina, the Toys R Us company expanded into South Carolina and engaged in business there. In upholding the tax on the royalty payments received by Geoffrey, the Supreme Court of South Carolina found purposeful direction by Geoffrey and minimum contacts for Due Process purposes and substantial nexus, as required under *Complete Auto,* for purposes of the Commerce Clause.

The *Geoffrey* case, however, did not address the licensing of a trade name by a foreign licensor to a foreign manufacturer which assembles and packages the product out of state for sale to wholesalers and retailers in the forum state. Moreover, *Geoffrey* did not address the situation where the wholly-owned subsidiary, as licensor, entered into licensing agreements not only with its affiliates but also with separate corporations or entities.

In *KFC Corporation v. Iowa Department of Revenue,* 792 N.W.2d 308 (Iowa 2010), *cert. denied,* —— U.S. ——, 132 S.Ct. 97, 181 L.Ed.2d 26 (2011), the Supreme Court of Iowa rejected a challenge under the Commerce Clause to an income tax assessment against KFC Corporation, a Delaware corporation. KFC's primary business was licensing its KFC trademark "and related system" to independent franchisees, including franchisees operating restaurants in Iowa. The Supreme Court of Iowa, in *KFC Corporation,* indicated that the assessment did not offend the Commerce Clause since intangibles owned by KFC were utilized in a fast-food business by franchisees "firmly anchored within the state." 792 N.W.2d at 324. Moreover, the Iowa court noted: "In order to comply with applicable standards, Iowa franchisees were required to purchase equipment, supplies, paper goods, and other products from only KFC-approved manufacturers and distributors." 792 N.W.2d at 311. The facts in *KFC Corporation* are, therefore, unlike the circumstances now before us.

Admittedly, the field of constitutional challenge to state taxation of foreign corporations with its varying levels of abstraction does not lend itself to black-letter law. There is no "one size fits all" line of precedent. Nevertheless, the distinction made in *Quill* and *MBNA* between the Due Process Clause and the Commerce Clause is not theoretical. Rather, the distinction is derivative of the organic law of the land. As recognized in *Quill,* a corporation may have the "minimum contacts" with a taxing state required by the Due Process clause but lack the "substantial nexus" with that state required under the Commerce Clause.

Upon all of the above, this Court holds that assessments against a foreign licensor for West Virginia corporation net income and business franchise tax, on royalties earned from the nation-wide licensing of food industry trademarks and trade names, satisfied neither "purposeful direction" under the Due Process Clause nor "significant economic presence" under the Commerce Clause, where the foreign licensor, with no physical presence in this State, did not sell or distribute food-related products or provide services in West Virginia and where: (1) all products bearing the trademarks and trade names were manufactured solely by unrelated or affiliated licensees of the foreign licensor outside of West Virginia, (2) the foreign licensor did not direct or dictate how its licensees distributed the products and (3) the licensees, operating no retail stores in West Virginia, sold the products only to wholesalers and retailers in this State. In so holding, this Court observes in accord with the principles of *Quill* and *MBNA* that, assuming *arguendo* the elements of the Due Process Clause were satisfied, the assessments against ConAgra

Brands would fail under the substantial nexus component of the Commerce Clause.

## V.

### Conclusion

The final order of the Circuit Court of Berkeley County invalidating the assessments for corporation net income tax and business franchise tax for the audit period June 1, 2000, through May 31, 2003, is affirmed.

Affirmed.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

BENJAMIN, J., concurring:

(Filed May 30, 2012)

I concur with the majority opinion which affirms the circuit court's ruling that ConAgra Brands' licensing transactions do not constitute doing business in West Virginia and that the tax assessments fail to meet the requirements of the Due Process and Commerce Clauses of the Constitution of the United States.

I write separately to reiterate my objections to *Tax Comm'r v. MBNA Am. Bank,* 220 W.Va. 163, 640 S.E.2d 226 (2006), which the Court discusses in the majority opinion in the instant case. In *MBNA,* the majority of this Court found tax liability for an out-of-state corporation with no tangible or intangible presence in this State on income realized out-of-state from accounts kept out of state. The Court based its finding of tax liability on what it termed "a significant economic presence test," *MBNA,* 220 W.Va. at 171, 640 S.E.2d at 234, to determine whether a substantial nexus existed for Commerce Clause purposes. In the instant opinion, the Court distinguishes *MBNA* by finding that ConAgra Brands did not engage in solicitation of the type conducted by the taxpayer in *MBNA.* While I certainly agree with this distinction, I would take the opportunity pre-

sented in this case to overrule *MBNA.* Otherwise, *MBNA* will continue to linger like a dormant virus in our body of law, threatening to erupt into a full-blown infection every time this Court is presented with a tax case like the instant one.[1]

I am fully aware that *MBNA* is only six years old, and the doctrine of *stare decisis* usually prohibits overruling such recent precedent. This Court has explained the importance of *stare decisis* as follows:

> The doctrine of *stare decisis* rests upon the principle that law by which men are governed should be fixed, definite, and known, and that, when the law is declared by court of competent jurisdiction authorized to construe it, such declaration, in absence of palpable mistake or error, is itself evidence of the law until changed by competent authority.

*In re Proposal to Incorporate Town of Chesapeake,* 130 W.Va. 527, 536, 45 S.E.2d 113, 118 (1947) (quotation marks and citation omitted). However, the doctrine of *stare decisis* is not sacrosanct, and in rare instances there are valid reasons to depart from it. For example, in the recent case of *State ex rel. W.Va. Dep't of Transp. v. Reed,* No. 11-1358, slip op. (W. Va. Feb. 10, 2012), this Court overruled a 2006 opinion of the Court after finding that the earlier opinion was legally incorrect. In doing so, the Court opined that while "this Court is loathe to overturn a decision so recently rendered, it is preferable to do so where a prior decision was not a correct statement of law." *Reed,* slip op. at 5–6 (quoting *Murphy v. Eastern Am. Energy Corp.,* 224 W.Va. 95, 101, 680 S.E.2d 110, 116 (2009)). This Court expounded in *Reed* that "a precedent-creating opinion that contains no extensive analysis of an important issue is more vulnerable to being overruled than an opinion which demonstrates that the court was aware of conflicting decisions and gave at least some persuasive discussion as to why the old law must be changed." *Reed,* slip op. at 6 (quoting *State v. Guthrie,* 194 W.Va. 657, 679 n. 28,

---

1. In *AccuZIP, Inc. v. Dir., Div. of Taxation,* 25 N.J.Tax 158 (2009), the Tax Court of New Jersey declined to follow this Court's opinion in *MBNA.* In doing so, the Tax Court quoted the assertion in my *MBNA* dissent that the U.S. Supreme

Court has never held in any state tax case that the nexus requirements of the Commerce Clause can be satisfied in the absence of a taxpayer's physical presence in the taxing state.

461 S.E.2d 163, 185 n. 28 (1995)). Similarly, the U.S. Supreme Court has articulated several crucial functions served by *stare decisis*.

Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments. The reasons for rejecting any established rule must always be weighed against these factors.

*Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). The Supreme Court noted that "[t]he first factor[ ] [is] often considered the mainstay of *stare decisis*." *Id.*

A proper analysis of the precedential value of *MBNA* using the factors set forth above compels the conclusion that *MBNA* should be overturned. First, *MBNA* is an incorrect statement of the law. As I commented in my dissent in *MBNA*,

by endorsing a nexus standard which permits West Virginia to assess a tax on an out-of-state corporation with no property, tangible or intangible, in this state on income realized from credit accounts maintained and serviced in another state, the majority merges the nexus requirements of the Due Process Clause and the Commerce Clause and effectively returns to the merged nexus jurisprudence of 1967, in [*National*] *Bellas Hess* [*Inc.,*] [*v. Department of Revenue*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled, in part, by Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) ], albeit with the minimal due process requirements now carrying the day for nexus determination rather than the physical presence requirement of *Bellas Hess.*

*MBNA*, 220 W.Va. at 175, 640 S.E.2d at 238 (Benjamin, J., dissenting). Second, *MBNA*

contains no extensive analysis. The majority in *MBNA* completely failed to consider that the Supreme Court "has never held in any state tax case that the nexus requirements of the Commerce Clause can be satisfied in the absence of a taxpayer's physical presence in the taxing state." *MBNA*, 220 W.Va. at 176, 640 S.E.2d at 239 (Benjamin, J., dissenting). Moreover, there is no precedential support whatsoever for the majority's holding in *MBNA*. In my dissent in that case, I explained that

the majority ... boldly goes where no court has gone before. In doing so, the majority relies not on bedrock constitutional principles or on established legal precedent, but rather on legal commentaries with thinly veiled state-favoring taxing agendas, a strained and inaccurate reading of the United States Supreme Court's decision in *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), and a unilateral restatement of the important policy considerations which led to the inclusion of the Commerce Clause within the United States Constitution because, according to the majority opinion, the framers could not possibly have foreseen the future.

*MBNA*, 220 W.Va. at 173–74, 640 S.E.2d at 236–37 (Benjamin, J., dissenting).

Finally, the first consideration of *stare decisis* which is the desirability that the law furnish a clear guide for the conduct of individuals, is wholly absent in *MBNA*. While the majority in *MBNA* announced a significant economic presence test, it failed to define such a test with any specificity. Notably, despite the fact that the decision in *MBNA* hinges on the significant economic presence test, the majority only briefly attempts to define such a test and does so simply by alluding to general factors such as purposeful direction, the degree to which a company has exploited a local market, both the quality and quantity of a company's economic presence, and the frequency, quantity, and systematic nature of a taxpayer's economic contacts with the State. I submit that such an amorphous test is practically useless in aiding an out-of-state entity in planning for its tax liability

arising from its economic contact with this State.

In sum, I believe this Court should have taken the opportunity in the instant case to overrule *MBNA* because it is not a correct statement of the law, it does not contain an extensive analysis of the relevant law, and it provides no clear guidance for individuals or entities to enable them to plan their affairs with assurance against untoward surprise. Otherwise, I concur with the majority opinion.