NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS
TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
 P.O. Box 975
 25 Market Street
 Trenton, New Jersey 08625
 Telephone (609) 815-2922
 TeleFax:  (609) 376-3018
 taxcourttrenton2@judiciary.state.nj.us

February 26, 2019

Richard C. Kariss, Esq.
Zachary T. Gladney. Esq.
Steven L. Penaro, Esq.
Alston & Bird, L.L.P.
New York, New York 10016

Michael J. Duffy, Esq.
Deputy Attorney General
Trenton, New Jersey 08625

> Re:    Crown Packaging Technology, Inc. v. Director, Division of Taxation
>         Dkt. No. 003249-2012

Dear Counsel:

This is the court's opinion as to plaintiff's motion for partial summary judgment.  Plaintiff seeks an Order voiding defendant's notices asking that plaintiff file corporation business tax ("CBT") returns for 1996-2010 since it received royalty income from its affiliate that does business in New Jersey.  Plaintiff argues that the two royalty-generating licensing agreements between plaintiff and its affiliate, allowing the affiliate the right to use plaintiff's intellectual property ("IP") nation-wide, cannot be the basis for New Jersey's jurisdiction over plaintiff, and to allow this would violate the Due Process Clause ("DPC") or the substantial nexus factor of the Dormant Commerce Clause ("DCC").

Defendant ("Taxation") opposes the motion, claiming the matter is not ripe for summary judgment.  Alternatively, it contends that summary judgment should be granted in its favor because

*

plaintiff is deemed to be doing business in New Jersey by receiving New Jersey-sourced royalty income under Lanco, Inc. v. Dir. Div. of Taxation, 21 N.J. Tax 200 (Tax 2003), rev'd, 379 N.J. Super. 562 (App. Div. 2005), aff'd, 188 N.J. 380 (2006), cert. denied, 551 U.S. 1131 (2007) (foreign entity's economic presence suffices as nexus under the DCC where entity earns New Jersey-sourced royalty income from the use of its IP by its affiliate in New Jersey).

For the reasons stated below, the court denies, without prejudice, plaintiff's partial summary judgment motion. The court agrees with plaintiff that there appear to be material facts here that are distinct from those in Lanco, and therefore, the ruling therein as to either the DPC or DCC may not automatically control or apply. However, those facts were not properly adduced, being neither certified to, nor included as materially undisputed facts, nor provided to Taxation during discovery, which discovery is still pending. Therefore, and since the court cannot rule as a matter of law that Taxation's notices asking plaintiff to file CBT returns are constitutionally impermissible, the court denies plaintiff's motion, but without prejudice.

**FACTS**

The facts are taken from the pleadings of the parties and supporting certified attachments. Plaintiff, f/k/a Crown Cork & Seal Technologies Corporation, is a Delaware corporation with its offices located in Illinois. Plaintiff is holding company, and a member of the Crown Holdings, Inc. ("Crown Group"). The latter apparently sells packaging products (packages, cans, containers and the like) world-wide. Plaintiff asserts that it is an active research and development company with extensive research facilities in Illinois and England, and owns/develops IP such as patents, know-how, technology, and trademarks, for use of the Crown group on a nation- and world-wide basis.

Crown Cork & Seal USA ("USA"), a Delaware corporation, is plaintiff's affiliate. USA is apparently in the "business of developing, manufacturing, marketing, and selling containers and related products and providing services related to such products."

On December 31, 1996, plaintiff entered into a Patent & Technology License Agreement (the "Patent Agreement") granting USA the rights to plaintiff's IP by:

> a perpetual, world-wide, non-exclusive right to develop, manufacture, have manufactured, use and sell any products employing . . . [plaintiff's IP] . . . (the "Licensed Products"), provide services related to the Licensed Products, and otherwise commercially exploit the [IP] . . . throughout the world, including the right to grant sublicenses.

In return, USA had to pay a royalty of 3% of the net sales of the Licensed Products. "Net sales" means the gross sales of the Licensed Products less discounts, taxes, shipping and insurance costs, if those are included in the "gross sales price." However, if USA paid royalty under the separate 1996 Trademark Agreement (see below), then it did not have to pay the 3% under the Patent Agreement. A 2005 amendment included certain specific IP, to which plaintiff gave USA the same rights as above, except that this was an exclusive license. USA had to pay plaintiff a royalty of 2.8% but as to any IP sublicenses, USA had to pay plaintiff 50% of the royalties USA received.

USA could sub-license plaintiff's IP without plaintiff's consent under the same conditions of the Agreement, with USA being responsible for the sub-licensee's compliance and obligations. Plaintiff was primarily responsible for all issues pertaining to its IP, including defending their validity. Any litigation involving the IP could be prosecuted/defended by plaintiff, or by plaintiff and USA jointly, and could be compromised or settled by plaintiff (upon notice to USA). If USA was a party in a third-party infringement claim, its out-of-pocket costs would be reimbursed by plaintiff. However, plaintiff disclaimed any obligations towards USA or USA's sub-licensees as

3

to, among others, the use of plaintiff's IP, the quality and performance of products manufactured and sold using the IP, or third-party claims relating to such products, or for "any failure" in the production, design or operation of such products. Plaintiff also disclaimed any liability to USA or a sub-licensee "for indirect, special, incidental or consequential damages." On the other hand, USA would indemnify, defend, and hold plaintiff harmless against any liability arising from, among others, the manufacture, use or sale of the Licensed Products.

On the same date, plaintiff entered into a separate Trademark License Agreement (the "Trademark Agreement"), which also granted USA a "perpetual, world-wide, non-exclusive" license to certain trademarks along with "slogans, logotypes, designs and trade dress" (collectively "Marks")

> (i) to use the Marks as part of its corporate name and the names of its Affiliates . . . and (ii) to use and permit its Affiliates to use the Marks in connection with the Business and on and in connection with the goods and services of the Business (the "Licensed Goods/Services").

USA had to pay a royalty of 3% of the net sales unless it paid royalty under the Patent Agreement. USA could sub-license plaintiff's trademarks without plaintiff's consent, but remained responsible for its and the sub-licensee's compliance and obligations with the terms of the Agreement. Plaintiff was primarily responsible for all issues pertaining to its IP, including defending their validity. Any litigation involving the IP could be prosecuted/defended by plaintiff, or by plaintiff and USA jointly, and could be compromised or settled by plaintiff (upon notice to USA). If USA was a party in a third-party infringement claim, its out-of-pocket costs would be reimbursed by plaintiff. There was no warranty disclaimer/indemnification provision.

In March 2012, Taxation audited USA. Since USA was deducting royalty payments made to plaintiff, Taxation conducted a spin-off audit of plaintiff. At the auditor's request, plaintiff

4

provided unsigned CBT returns for 1997-2005, excluding tax year 2002, claiming that USA did not pay royalties that year. The returns computed CBT at 9% of the gross receipts. Plaintiff did not provide the IP agreements, but provided royalty study reports prepared by Pricewaterhouse Coopers on accepted royalty rates. Taxation therefore imputed royalty payments for 1996-2010, and apportioned 0% to Illinois since it was a combined reporting jurisdiction. Apparently, the Illinois return showed that royalty income was not included in the numerator of the sales fraction on the apportionment schedule. Taxation allocated the royalty income to New Jersey using USA's allocation factor, and computed CBT (plus interest and penalties) totaling $2,099,619.16 for tax years 1997-2010.

Plaintiff then submitted a settlement offer to Taxation for both itself and USA, which Taxation rejected on May 1, 2012. Taxation further required that plaintiff file tax returns within 30 days of receipt of the correspondence, else it would levy an arbitrary assessment on plaintiff.

Promptly thereafter, plaintiff filed the instant complaint in the Tax Court on May 30, 2012, seeking injunctive and declaratory relief from any proposed arbitrary or other assessment, alleging that requiring it to file CBT returns violated the DPC and DCC because it had no physical or other presence in New Jersey.[1] The court denied temporary restraints and injunctive relief.

This partial summary judgment motion followed. Plaintiff's president averred that plaintiff developed IP "for the nation-wide business operations" of the Crown Group; plaintiff had no physical presence in New Jersey in 1996-2010; USA "conducts a packaging products manufacturing business in which it uses" plaintiff's IP; USA is plaintiff's only domestic related-

---

[1] Thus, Taxation's requests of October 16, 2012, and February 1, 2013, for plaintiff to file CBT returns for 1996-2010 were in vain. Therein, Taxation stated that plaintiff was doing business in New Jersey having "receiv[ed] royalty payments from sales in New Jersey," and required plaintiff to self-assess by filing CBT returns within 30 days.

party licensee; and USA did not manufacture packaging products in New Jersey. In its answers to Taxation's interrogatories, plaintiff stated that the "only connection between" plaintiff's IP and New Jersey was (1) on USA's employees' business cards, stationery, or other advertising material given to USA's current or potential New Jersey customers; (2) on USA's shipping materials used to ship USA's products into New Jersey; and (3) on USA's products, but only in "certain instances" and then, those were "small and inconspicuous to the consumer." Plaintiff also stated that other than space rented by USA in New Jersey to store its packaging products during "certain periods" in 1996-2010, neither USA nor any related member owned/used/leased any office, retail outlet, warehouse, or other building in New Jersey.

During oral argument, plaintiff's counsel, in the course of expounding on the three limited instances of USA's use of plaintiff's IP, produced a sample of a product manufactured and sold by USA for illustrative purposes, and to show that plaintiff's IP was not the same as the IP in Lanco (the name "Lane Bryant" displayed on retail store fronts). The product was an aerosol shaving cream can. It contained the logo, a crown symbol in a small space, with the prominent display of the name Barbasol on the can, which name does not belong to plaintiff or USA. Per plaintiff's counsel, USA uses advanced technology and know-how in manufacturing such cans, places the crown logo (plaintiff's IP) on the same, then after an order is placed, sells and ships the cans to Barbasol (an unrelated entity which sells, among others, shaving cream in aerosol cans). Barbasol then apparently fills in its shaving cream, assembles the cans, and sells the filled cans to its customers, including those in New Jersey. USA apparently also manufactures similar cans for selling other aerosol products (WD40) or food cans. Per plaintiff's counsel, USA's customers are only manufacturers or wholesalers. Counsel also alleged that plaintiff's IP (the logos) are placed on USA's products solely for liability purposes so that if the aerosol can fails, the potential victim

6

could identify the manufacturer.  He stated that in many instances, the crown mark is not placed on the aerosol cans, which is when the shrink wrap encasing the aerosol cans would contain the crown logo, again purely for liability purposes.  None of this information was contained in the moving papers, nor were any of these materials (such as the container) produced for Taxation's review or examination during discovery.  Nor was the manner of USA's operations, or the nature/manner of USA's customers, certified to by anyone from USA.

Taxation opposed the motion, claiming discovery was ongoing (it did not yet know the names of the sub-licensees[2] and had presently issued subpoenas for the deposition of plaintiff's president and another person); facts were being adduced during oral argument; and that if a decision was to be rendered as a matter of law, then Taxation should win under Lanco.

**ANALYSIS**

Plaintiff concedes that under Lanco, New Jersey can impose CBT regardless of plaintiff's lack of physical presence.  However, it claims, Lanco does not apply here because the facts are different, and also because the trial court's reference to the inapplicability of the DPC is non-binding dicta.

In Lanco, the issue was whether a foreign entity could be required to file CBT returns if it lacked physical presence, but received royalty income from "a New Jersey source only pursuant to a license agreement with another corporation that conducts a retail business here."  21 N.J. Tax at 203.  The facts pertinent to this issue were that Lanco, a Delaware corporation, owned "trademarks, trade names and service marks," which it licensed to its affiliate Lane Bryant, Inc. Ibid.  The latter used such IP in its "retail operations, including . . . in New Jersey," and paid Lanco

---

[2]  The court had, in the context of a discovery motion, ordered plaintiff to provide the names of four non-related domestic sub-licensees to Taxation.

a royalty for the same. Ibid. Lanco had no "offices, employees, or real or tangible property in New Jersey." Ibid. The court noted that Lanco had a "direct long-term contractual relationship with a related entity doing business in New Jersey." Id. at 218. There were additional facts, most being stipulated, and many unresolved, and only the stipulated facts pertinent to the constitutional nexus issue were recited. Lanco, 379 N.J. Super. at 567 n.3, 573 n.5.

However, these limited facts are also present here. Plaintiff is a foreign corporation, which owns IP, and licenses the same to USA for use in the manufacture and sale of USA's packaging products. In return, plaintiff receives royalty based on the net sales amount. Plaintiff concedes that USA has New Jersey-based customers and does business in New Jersey.

Plaintiff argues that its significantly distinguishing facts render Lanco inapplicable. Those alleged facts are: (1) plaintiff is not a standard, passive, shell Delaware holding company that owns and licenses IP to a subsidiary; (2) USA is not a retailer; (3) USA never manufactured products in New Jersey; (4) USA's customers are not retailers; (4) USA manufactures packaging products after specific orders (as opposed to mass manufacturing); (5) neither plaintiff nor USA had any control over where or how USA's customers sold their products that were contained within USA's packages (example: the shaving cream of Barbasol contained within the aerosol cans manufactured and sold to Barbasol by USA); (5) plaintiff's IP is used at most in three instances; and plaintiff's logos are barely visible on USA's products, as compared to the large "Lane Bryant" signs on retail store fronts or within such stores.

First, the court agrees that some of these facts, particularly plaintiff's remoteness from the use of its IP and lack of control by plaintiff or USA over placement of USA's products in New Jersey, if true, could possibly require this court to analyze whether requiring plaintiff to file CBT

returns for 1996-2010 violates the DPC or the DCC. This is because the trial court itself noted as follows:

> It is appropriate to note, in addition, certain considerations that arise from the particular facts of this case. The plaintiff, while not physically present in the state, does have a direct long-term contractual relationship with a related entity clearly doing business in New Jersey. The case does not therefore concern isolated transactions, indirect connections or distant actors who cannot anticipate where the products of their effort, tangible or intangible, may come to be employed. If physical presence were not a requirement, nexus might be found in the circumstances of this case, but not necessarily in cases where there is no direct contractual relationship between the producer of property and its user in this state. There are other factors besides physical presence that can limit nexus findings and prevent taxation of remote parties. Certainly the due process standards of notice and fair warning will continue to hold . . . .
>
> [Lanco, 21 N.J. Tax at 218 (emphasis added).]

Second, in holding that "it is impossible to conclude that [Lanco's] agreement with Lane Bryant does not satisfy the [DPC] standard in that Lanco has purposefully availed itself of the benefits of an economic market in New Jersey," id. at 214, the court relied upon Quill Corp. v. North Dakota, 504 U.S. 298, 307-08 (1992). Quill, thus, is the controlling standard, wherein the United States Supreme Court held that for purposes of the DPC nexus analysis, the inquiry is in terms of "purposeful avail[ment]" of a State's economic market, which in turn would be "notice" or "fair warning" of susceptibility to that State's taxing jurisdiction. 504 U.S. at 308, 312-13.[3]

---

[3] For this reason, the court does not need to analyze whether the trial court's holding in Lanco as to the DPC violation is non-binding dicta since this portion of the court's ruling was not appealed, and therefore, the Appellate Division observed that that it did not "need [to] comment on the Tax Court's thorough and well-reasoned analysis of the Due Process issue." Lanco, 379 N.J. Super. at 562 n.1. The court nonetheless notes that since the trial court's ruling on the DPC was based on stipulated facts, thus, was a decision as a matter of law, it renders acceptance of the same by the Appellate Division as something more significant than mere dicta.

Note also that Taxation, during appeal, cited to these same standards when it argued that the rationale of the DPC, namely, "that businesses [remotely] engage in significant levels of commercial activity . . . and foresee being subject to state tax laws as a result of commercial activity

Third, Taxation itself recognized that its regulatory example imputing nexus or "doing business" to a foreign IP holding company receiving royalty from its related member for use of such IP, "assumed that the activities of the" foreign entity met the "nexus requirements," however, Taxation "will look to the purposeful exploitation of the New Jersey market and a 'presence' in the State of New Jersey that is more than de minimis." See 28 N.J.R. 4795(a). Note that Taxation's regulation, N.J.A.C. 18:7-1.9(b), promulgated in 1996, exemplified the term "doing business" as including a foreign holding company receiving royalty from licensing its IP (such as trademarks) to New Jersey companies for use in New Jersey due to "its trademark licensing activities," based on the decision in Geoffrey, Inc. v. S.C. Tax Comm'n, 437 S.E.2d 13 (S.C.), cert. denied, 510 U.S. 992 (1993), which had so held. See 28 N.J.R. 4795(a); Lanco, 21 N.J. Tax at 217 (N.J.A.C. 18:7-1.9 "amend[ment] to include the licensure of trademarks to retailers operating in New Jersey" was "unquestionably" adopted as a "response to the question of the necessity of physical presence for nexus in light of Quill and Geoffrey. . .").

Fourth, in Griffith v. ConAgra Brands, Inc., 728 S.E.2d 74 (W. Va. 2012), the court held that the foreign licensor entity did not have either minimum contacts for DPC purposes, nor substantial nexus for DCC purposes, despite receiving royalty payments that could be sourced to the state. The court observed that Geoffrey was inapplicable because it "did not address the licensing of a trade name by a foreign licensor to a foreign manufacturer which assembles and packages the product out of state for sale to wholesalers and retailers in the forum state . . . [nor] the situation where the wholly-owned subsidiary, as licensor, entered into licensing agreements not only with its affiliates but also with separate corporations or entities." Id. at 84. Although an

---

directed at a particular state," should also be the same rationale for purposes of the DCC nexus analysis. Id. at 566. The Appellate Division agreed with this argument. Ibid.

out-of-State case, thus not controlling, it is nonetheless persuasive since this court agrees that the additional facts as alleged during oral argument, if true, were not addressed by the Appellate Division in Lanco, which had relied heavily on Geoffrey to rule that physical presence is unnecessary for purposes of the DCC nexus issue.[4]

Consequently, it is not out of the realm of possibility that even if a foreign entity licensor receives royalty income from the use of its IP in New Jersey by a related entity that does business in New Jersey, that licensor is not foreclosed from showing that it lacked minimal contacts or derivate nexus based on certain facts. Here, the language of the licensing agreements between plaintiff and USA indicated an explicit desire for USA to "commercially exploit" the manufacture and sale of its products/services using plaintiff's IP on a world-wide basis, with no geographical limitation as to New Jersey. Plaintiff is paid a royalty based on sales by USA. These facts allow for an implication that plaintiff sought to benefit from New Jersey's economic market. However, the alleged lack of control over where and how USA's customers sold their products could weaken this "purposeful availment" factor, especially if USA or its customers are not retailers, thus did not

---

[4] Similarly, in Scioto Ins. Co. v. Okla. Tax Comm'n, 279 P.3d 782 (Okla. 2012), the court held that Oklahoma cannot attempt to tax a foreign entity receiving royalties from its related member doing food business in Oklahoma using the entity's IP under licensing agreements entered into outside Oklahoma. The court held that the state had "no connection to or power to regulate the licensing agreement" and that the matter was different from Geoffrey because the IP entity was "not a shell" and the "licensing agreement [was] not a sham obligation to support a deduction" for Oklahoma income tax purposes. Id. at 783-84. The court concluded that the state tax authority could not "summarily disregard the licensing agreement simply because it produces a deduction that [it] . . . does not like." Id. at 784. The dissent, however, reasoned that Geoffrey should apply since the IP entity "intentionally placed [its IP] in the stream of Oklahoma's commerce, and purposefully sought the advantages of economic contact with our State," and such "economic presence was sufficient contact to satisfy the fundamental principles mandated by the" DPC. Id. at 785-86 (Gurich, J., dissenting) (relying on Geoffrey). Given that this court agrees with Geoffrey that it is not the contract that forms a basis for jurisdiction, see infra pp. 15-16, it does not consider Scioto persuasive.

11

direct use of plaintiff's IP to New Jersey consumers as in Lanco, Geoffrey, and Quill. Cf. Geoffrey, 437 S.E. 2d at 15, 16 (foreign licensor was not "unwillingly brought into contact with South Carolina through the unilateral activity of an independent party," rather, licensor's business was "ownership, licensing, and management of" its IP, and by "electing to license its [IP] for use by [its affiliate licensee] . . . in many states, [licensor] contemplated and purposefully sought the benefit of economic contact with those states," especially since it did not bar its use in South Carolina as it had in several states, including New Jersey).

These same alleged distinguishing facts may also render the DCC nexus analysis in Lanco as inapplicable.[5] The only question decided in Lanco was whether the DCC's nexus component requiring a substantial nexus to the taxing state can be met in the absence of physical presence. Lanco did not decide the quality or quantity of contacts deemed to be substantial.

In Quill also there was no bright-line test or articulated standard on what or how much is "substantial nexus" under the DCC analysis. The first court agreed that "the presence in the taxing State of a small sales force, plant, or office" could satisfy the DCC's substantial nexus component, and that Quill's "title to 'a few floppy diskettes' present in the State," could be "minimal nexus." Quill, 504 U.S. at 315 & n.8. It nonetheless rejected a "slightest presence standard of constitutional nexus," therefore, held that "Quill's licensing of software" was not substantial nexus. Id. at 315

---

[5] The DCC is analyzed under a four-part test. The first is that the tax be applied "to an activity with a substantial nexus with the taxing State." Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 297 (1977). The tax must also be "fairly apportioned," non-discriminatory, and "fairly related to the services provided by the State." Ibid. Note that in Lanco, the court held that the last three factors were not implicated because: (1) Taxation was only requiring Lanco to file returns; (2) domestic or foreign entities were both being subject to the CBT on royalty or license income, whether or not the foreign entities were physically present; and (3) "Lanco's intangibles are utilized in the conduct of Lane Bryant's retail business," thus, Lanco was "clearly enjoy[ing] the same benefits provided to Lane Bryant." Lanco, 21 N.J. Tax at 215.

n.8 (citation and internal quotation marks omitted). Thus, it would appear that there must be more than a de minimis physical presence of a foreign entity in the taxing state for purposes of the DCC nexus analysis, but not much more than minimal contacts.

The dissent noted that the majority did not articulate "what constitutes the requisite" amount of presence for purposes of the substantial nexus factor of the DCC. Id. at 330 (White, J., dissenting). The dissent also noted that given the state's assertion of Quill's physical presence, and Quill's concession of economic presence via its software licensing (but arguing such presence is "insufficient") shows that "[r]easonable minds surely can, and will, differ over what showing is required to" establish a presence which is "adequate" enough "to justify imposing" a tax. Id. at 330-31. Thus, the appropriate manner to decide the quality and quantity of contacts with the state would be to remand the case, rather than a ruling "as a matter of law" that "Quill's ownership of software [is not] sufficient physical presence under its new Commerce Clause nexus requirement." Id. at 330 n.3. Such a ruling "rebuffs North Dakota's challenge without setting out any clear standard for what meets the Commerce Clause physical-presence nexus standard and without affording the State an opportunity on remand to attempt to develop facts or otherwise to argue that Quill's presence is constitutionally sufficient." Ibid.

Based on the above precedent, the court agrees with plaintiff that Lanco is not automatically controlling as to either the DPC or DCC. However, the court cannot rule here, as a matter of law, that Taxation violated either the DPC or the substantial nexus component of the DCC. The matter was brought before this court as a partial summary judgment motion when discovery was still incomplete and pending. Verily, plaintiff's allegation that USA did not manufacture products in New Jersey and that neither plaintiff nor USA had any physical presence in New Jersey were averred or certified to, and were not disputed by Taxation for purposes of

13

plaintiff's partial summary judgment motion. However, while it also certified to the limited use, employment, or "inconspicuous" display of plaintiff's IP in three circumstances via interrogatory responses, the same were not accepted as materially undisputed facts by Taxation. More importantly, much of the crucial, and alleged, distinguishing facts, such as USA's manner and method of operations, the nature of USA's customers, and plaintiff's lack of control over the manner and method of how USA's customers used USA's products in New Jersey, were all provided for the first time during oral argument, and then by plaintiff's counsel. They were not contained in the moving papers, nor were any materials (such as the container) produced for Taxation's review or examination during discovery, nor was the manner of USA's operations or the nature/manner of USA's customers certified to by anyone from USA. Thus, Taxation's objections as to several factual assertions made by plaintiff's counsel during oral argument, to wit, a description of USA's business process, its products, and its clientele, in an effort to distinguish plaintiff from the plaintiff in Lanco since they were being asserted for their truth, are well-taken.

Thus, the court cannot, without affording Taxation the opportunity to explore these proffered facts, decide, as a matter of law and based on the illustrative evidence offered by plaintiff's counsel during oral argument, that Taxation violated the DPC or DCC substantial nexus requirement, or that the alleged contacts by plaintiff are none or less than minimal, or less than substantial. This is especially considering plaintiff's counsel's statement that plaintiff's IP is not just the crown logo, but are incorporated into the very manufacture of the highest quality packaging products using plaintiff's patented technology, know-how and trade secrets. The latter would then require a factual finding as to the quantity of USA's products used in New Jersey, not just the crown logos imprinted on one or two cans. Even in Griffith, where the facts are similar to those being claimed here by plaintiff's counsel, the trial court's ruling that the licensor had no minimum

14

or substantial contacts was based on stipulated facts and "adjudicated findings."  See 728 S.E.2d at 76-77.  Of note is also the Appellate Division's remand in Lanco, which stated that since it "merely address[ed] the fundamental issue presented," the matter would be remanded to "allow further development before that court of any remaining relevant or material factual contest which may affect the taxability, determination of apportionment of income attributable to New Jersey, or tax for any particular tax year in question."  Lanco, 379 N.J. Super. at 567 n.3.  It may very well be that if the facts provided by counsel during oral argument, facts pertaining to USA's operations and USA's customers, are reviewed by Taxation, Taxation may consider plaintiff as being constitutionally safe under the DPC or DCC since it would "look to the purposeful exploitation of the New Jersey market and a 'presence' in the State of New Jersey that is more than de minimis." 28 N.J.R. 4795(a).  Nonetheless, any ruling by the court in this regard must await Taxation's factually based determination, whether by trial or another round of summary judgment motions.

Although plaintiff argues that the two licensing agreements cannot be the basis for New Jersey asserting constitutional jurisdiction over plaintiff, Taxation was not basing its request that plaintiff file CBT returns because it had licensing agreements with USA.  Rather, the request was because plaintiff was receiving New Jersey sourced royalty income from USA, which, under N.J.S.A. 54:10A-2, and N.J.A.C. 18:7-1.9, would obligate plaintiff to file CBT returns and report the same.  As was lucidly pointed out: "[t]he real source of [a licensor's] income is not a paper agreement, but [the state's] . . . customers."  Geoffrey, 437 S.E.2d at 18.  Thus, plaintiff is not entitled to a ruling that, as a matter of law, it had no constitutionally sufficient contacts with New Jersey.  See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985) (court's inquiry does not end with the contract alone, but will also consider factors such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual

course of dealing."); <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 318-19 (1945) (one or two acts "may be deemed sufficient" for exercising personal jurisdiction over an entity "because of their nature and quality and the circumstances of their commission," thus, the test for minimum contacts is not "mechanical or quantitative," or whether an entity's activity (own or through someone else) "is a little more or a little less," rather it is "the quality and nature of the activity in relation to the fair and orderly administration of the laws. . .").

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." <u>R.</u> 4:46-2(c); <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 523 (1995). Here, and while the court agrees with plaintiff that this matter does not automatically and squarely fall within the ruling in <u>Lanco</u> due to certain distinct facts specific to plaintiff, those facts were not properly and legally adduced in connection with plaintiff's motion. Therefore, the court cannot rule as a matter of law that the alleged facts render plaintiff safe under the DPC or DCC's nexus tests.

**CONCLUSION**

For the aforementioned reasons, plaintiff's partial summary judgment motion is denied without prejudice.

Very truly yours,

Mala Sundar, J.T.C.

16