# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Fall 2023 Term

_____

No. 22-ICA-111; 22-ICA-225; 22-ICA-226

_____

FILED

**November 15, 2023**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

STATOIL USA ONSHORE PROPERTIES, INC.,
Petitioner Below, Petitioner,

vs.) No. 22-ICA-111

MATTHEW IRBY, STATE TAX COMMISSIONER OF WEST VIRGINIA,
Respondent Below, Respondent.

AND

STATOIL USA ONSHORE PROPERTIES, INC.,
Petitioner Below, Petitioner,

vs.) No. 22-ICA-225

MATTHEW IRBY, STATE TAX COMMISSIONER OF WEST VIRGINIA,
Respondent Below, Respondent.

AND

EQUINOR USA ONSHORE PROPERTIES, INC.,
Petitioner Below, Petitioner,

vs.) No. 22-ICA-226

MATTHEW IRBY, STATE TAX COMMISSIONER OF WEST VIRGINIA,
Respondent Below, Respondent.

Appeal from the West Virginia Office of Tax Appeals
Docket Nos. 19-008, 19-064, 20-111, 20-222, 22-023

REVERSED and REMANDED with DIRECTIONS
_____

Submitted:  September 6, 2023
Filed:  November 15, 2023

Alexander Macia, Esq.
Paul G. Papadopoulos, Esq.
Chelsea E. Thompson, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Sean Whelan, Esq.
Deputy Attorney General
William Ballard, Esq.
Lauren D. Mahaney, Esq.
Kevin C. Kidd, Esq.
Assistant Attorneys General
Charleston, West Virginia
Counsel for Respondent

JUDGE LORENSEN delivered the Opinion of the Court.

LORENSEN, Judge:

Petitioner Equinor USA Onshore Properties, Inc., previously known as Statoil Onshore Properties, Inc. ("Equinor"), appeals three decisions of the West Virginia Office of Tax Appeals ("OTA") affirming the Respondent West Virginia State Tax Commissioner's denial, in part, of Equinor's claims for refund of severance tax for several tax years. On each appeal, Equinor argues that OTA erred by using the incorrect value of natural gas liquids ("NGLs")[1] produced by Equinor when computing severance tax and that OTA further erred when it affirmed the Tax Commissioner's denial of Equinor's asserted transportation and transmission deduction in calculating the tax base.

In Case No. 22-ICA-225, the Tax Commissioner asserts a cross-assignment of error arguing that OTA erred in applying equitable estoppel to hear Equinor's petition for refund that Equinor filed thirteen months after Equinor's receipt of the Tax Commissioner's notice of determination denying, in part, its claim for severance tax refund for tax year 2015.

Upon consideration of the parties' briefs and oral arguments, the submitted record, and the applicable authorities, this Court finds that Equinor's claims for refund properly reported gross value of the NGLs at the wellhead and the Tax Commissioner, as affirmed by OTA, applied an incorrect (higher) value, resulting in an improper refund

---

[1] NGLs include butane, propane, methane, and ethane.

1

denial. We further find that the record supports Equinor's contention that it is entitled to the safe-harbor transportation and transmission deduction. Finally, this Court finds that the Tax Commissioner is correct that Equinor may not recover any further severance refund for tax year 2015 claim because its petition for refund for that year was untimely filed with OTA. Accordingly, we reverse OTA in 22-ICA-111 and 22-ICA-226 and remand with directions that OTA direct the Tax Commissioner issue refunds consistent with this opinion, and we reverse the OTA in 22-ICA-225 and direct that OTA dismiss Equinor's untimely petition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Equinor is a natural gas producer operating in various states, including West Virginia. These appeals involve the calculation of West Virginia severance tax imposed upon Equinor for producing NGLs at West Virginia wells for the five tax years in dispute.

At each well, Equinor recovers an impure mix of various liquid and gaseous natural resources, together with water and sediment. Equinor uses its own production equipment in the field to transform the impure mix into "raw gas" that is in turn transported and transmitted through Equinor's pipeline facilities to a fractionation plant located in West Virginia owned and operated by MarkWest Liberty Midstream & Resources LLC ("MarkWest"). Equinor sells raw gas to MarkWest at the inlet of the fractionation plant ("Plant Inlet"). Once Equinor's raw gas reaches the Plant Inlet, MarkWest obtains title to the NGLs contained in the raw gas. From the Plant Inlet onward, MarkWest has exclusive

2

custody, control, ownership, and possession of the raw gas NGLs. Equinor does not own, market, or sell the NGLs beyond the Plant Inlet.

At the fractionation plant, MarkWest breaks down the raw gas into its component parts: "raw make," which are unprocessed NGLs, and "residue gas." Throughout processing and fractionation, MarkWest maintains title, custody, control, and possession of the raw make and the resulting processed NGLs. Once fractionation is complete, MarkWest then transmits and sells the NGLs to third parties. MarkWest transports the separated NGLs to the final consumer through pipelines owned by MarkWest or by third parties. MarkWest determines to whom the NGLs are sold and at what price.

Equinor and MarkWest are not affiliated by ownership. In addition to purchasing raw gas from Equinor, MarkWest also obtains raw gas at its West Virginia fractionation plant from other producers. Equinor's relationship with MarkWest is governed by two separate agreements: a Second Amended and Restated Gas Processing Agreement on December 1, 2013 ("Gas Processing Agreement") and a Natural Gas Liquids Exchange and Purchase Agreement dated March 1, 2011 ("NGL Agreement").[2]

---

[2] The NGL Agreement contemplates two alternate relationships among the parties. First, Equinor had the option of selling its raw gas liquids to MarkWest in exchange for a cash payment. In the alternative, Equinor also had an option to deliver the raw gas liquids to MarkWest in exchange for an in-kind amount of processed NGLs on terms set forth in the NGL Agreement. Equinor chose to sell for cash and not opt into the exchange transaction. Accordingly, once Equinor delivered raw gas to MarkWest at the Plant Inlet, Equinor no longer has title to or control of the resulting product which MarkWest sold to third parties at prices determined by MarkWest in its judgment.

3

To account for these transactions under the NGL Agreement, MarkWest drafts and delivers to Equinor monthly settlement statements identifying component NGLs it processed from the raw gas it purchased from Equinor. Each monthly settlement statement identifies and calculates a "product value," "fees," and a "net value." The product value shown on a settlement statement is calculated by multiplying the gallons of Equinor supplied NGLs times the weighted average sales price per gallon that MarkWest received for each type of processed NGL that MarkWest sells to third parties during the applicable calendar month. The fees shown on a settlement statement itemize various transportation, storage, marketing, and processing costs that MarkWest itself incurred or is deemed to incur in processing the raw gas into raw make and residue gas, further fractionating the raw make into individual NGLs, and delivering the NGLs to remote markets. In determining the net value shown on a settlement statement, MarkWest subtracts the fees from the product value. The net value on the settlement statement constitutes the amount MarkWest pays to Equinor for purchase and sale of the raw gas converted into NGLs at the Plant Inlet. This net amount paid by MarkWest to Equinor is also referenced as the "net sales price" in the NGL Agreement.[3]

---

[3] Equinor established that the net values on the settlement statements are reported as "gross proceeds" for federal income tax reporting purposes because the net value figure constitutes funds ultimately received by Equinor and paid by MarkWest.

4

In severance tax returns originally filed with the Tax Commissioner for all periods at issue on these appeals, Equinor reported the higher "product value" from the settlement statements as the gross value of the NGLs produced by Equinor subject to tax. Equinor later filed amended severance tax returns claiming overpayment refunds for these tax years, adjusting the tax base from the "product value" to the lower "net value" amounts on the settlement statements and further asserting a 15% allowance for transportation and transmission incurred by Equinor in moving the raw gas from the wellhead to the Plant Inlet. The Tax Commissioner granted refunds in part and denied refunds in part for each tax year and issued separate notices of determination to Equinor. Equinor filed petitions for refund with the OTA.

The OTA, after a hearing, affirmed the Tax Commissioner's denial of refund for the 2014 and 2016 tax years.[4] The OTA concluded that (1) the market value of natural gas in the vicinity of the wellhead for severance tax purposes is the amount reflected as the "product value" on the settlement statements, less some but not all the "fees" shown on the settlement statement as deductions to arrive at the "net value", and (2) transportation costs incurred by Equinor in moving raw gas from the wellhead to the Plant Inlet cannot be

---

[4] The parties agreed to be bound, for all years at issue in these appeals, by a test case involving tax years 2014 and 2016 (ICA Case No. 22-ICA-111). The agreement did not relate to the issue concerning timeliness of Equinor's petition for the 2015 tax year, discussed *infra*.

deducted from the gross proceeds of the sale in calculating the tax base. This decision was applied to all tax years at issue on this appeal.

Equinor's tax year 2015 claim for refund raises a separate issue. On June 28, 2018, Equinor filed a $4,837,548.01 claim for refund of severance tax for the 2015 tax year. On January 23, 2019, the Tax Commissioner issued a notice granting in part and denying in part the tax refund claim. After receiving the notice, Equinor's tax agent contacted the Tax Department to discuss mathematical and accounting concerns in the Tax Commissioner's notice of denial. The Tax Department employee informed Equinor that it would reconsider the issue. On February 27, 2019, the Tax Commissioner issued a revised (second) notice concerning the 2015 year approving a tax refund of $3,285,559.33 but denying the remainder of the claim.[5] The Tax Commissioner caused a refund check in this amount to be issued to Equinor.

Soon after the second notice, Equinor's tax agent again called the Tax Department to discuss concerns about calculations underlying the second notice. Equinor's tax agent testified that during this call it was clear to both the agent and the Tax Department

---

[5] The second notice, like the first notice, informed the taxpayer as follows:

If you have any objections to this decrease of overpayment of tax, you must file a petition for reassessment with [OTA]… within sixty (60) days from receipt of this letter…. If you fail to file the aforesaid petition within the time prescribed by law, the decreased overpayment shall become conclusive.

6

that Equinor would be appealing the reduction in its severance tax refund claim for 2015. He further testified that he was told there would be a third refund denial notice issued after the additional error was explored. Ultimately, the Tax Commissioner caused another refund check for the 2015 tax year to be issued to Equinor for $23,671.54. The Tax Commissioner did not issue a third notice to reflect this or any other change in processing the 2015 tax year claim. The second notice issued February 27, 2019, was the last notice issued by the Tax Commissioner concerning the 2015 tax year.

On April 7, 2020, Equinor filed a petition for reassessment with OTA concerning the portion of its 2015 refund claim that was denied. The Tax Commissioner filed its answer and a motion to dismiss for lack of jurisdiction considering West Virginia Code § 11-10-14(d)(1)'s mandatory requirement that "no petition for refund or credit may be filed more than sixty days after the taxpayer is served with notice of denial of taxpayer's claim." Equinor opposed the motion, arguing that the Tax Commissioner should be equitably estopped from challenging the OTA's jurisdiction because Equinor believed that a third notice of denial of would be issued by the Tax Commissioner based on its conversations with the Tax Department employee.[6] On January 8, 2021, after an evidentiary hearing on the motion to dismiss, OTA granted the Tax Commissioner's

---

[6] The senior tax audit clerk handling the matter passed away in late 2019.

7

motion to dismiss. Equinor timely appealed the OTA decision to the Circuit Court of Kanawha County seeking reversal.[7]

In an April 12, 2022 order, the circuit court reversed OTA, holding that OTA erred when it required Equinor to demonstrate "affirmative misconduct" or "wrongful conduct" in considering whether to apply equitable estoppel principles to consider facially untimely petitions to OTA. The circuit court directed OTA to consider the public policy implications of equitable estoppel. On remand, the OTA weighed equitable estoppel elements articulated in *Hudkins v. State Consolidated Public Retirement Board*, 220 W. Va. 275, 674 S.E.2d 711 (2007) (per curiam) and denied the Tax Commissioner's motion to dismiss. On October 7, 2022, OTA entered its decision affirming the Tax Commissioner's partial refund denial of Equinor's 2015 tax year claim based on the same logic applied in the other tax years at issue in this appeal.

## II.     STANDARD OF REVIEW

The West Virginia Administrative Procedures Act sets forth the standard of judicial review by this Court as follows:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse,

---

[7] Kanawha County Circuit Court was the appropriate appellate court for OTA appeals prior to the effective date of the Judicial Reorganization Act of 2021, which created this Court. In general, appeals of final administrative agency and administrative law judge decisions fall under the jurisdiction of this Court for final orders after June 30, 2022. W. Va. Code § 51-11-4(b)(4) (2022).

vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority or jurisdiction of the agency; (3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

See W. Va. Code § 29A-5-4(g) (2021).

Further, regarding reviews of OTA decisions, the Supreme Court of Appeals

of West Virginia states:

In an administrative appeal from the decision of the West Virginia Office of Tax Appeals, this Court will review the final order of the circuit court pursuant to the standards of review in the State Administrative Procedures Act…. Findings of fact of the administrative law judge will not be set aside or vacated unless clearly wrong, and, although administrative interpretation of State tax provisions will be afforded sound consideration, this Court will review questions of law *de novo.* Syllabus Point 1, *Griffith v. ConAgra Brands, Inc.*, 229 W. Va. 190, 728 S.E.2d 74 (2012).

Syl. Pt. 1, *Antero Res. Corp. v. Steager*, 244 W. Va. 81, 851 S.E.2d 527 (2020).[8]

---

[8] The legislature amended W. Va. Code § 11-10A-19 (2023) to among other things clarify that appeals from final decisions of OTA lie with this Court. Although not raised by the parties, this Court recognizes that there is discrepancy in the date this Court gained jurisdiction over administrative appeals generally (July 1, 2022) and the effective date of 2023 amendments to West Virginia Code § 11-10A-19. Relevant to the timing of the appeals in this case, we find that the amendments to West Virginia § 11-10A-19 clarify the general jurisdictional provisions in West Virginia Code § 51-11-4(b)(4) and § 29A-5-4 and that we properly have jurisdiction over these appeals.

## III. DISCUSSION

On appeal, Equinor presents three issues: (1) whether the "product value" or "net value" reflected on the settlement sheets is the proper starting point for determining the "gross value" or "gross proceeds" subject to severance tax; (2) whether the fees subtracted from the "product value" by MarkWest on the settlement statements are Equinor's actual transportation and transmission expenses as defined by West Virginia Code of State Rules §110-13A-4.8.1; and (3) whether Petitioner is entitled to the 15% safe harbor deduction for transportation and transmission costs. A fourth issue, raised by the Tax Commissioner in the cross-assignment in Case No. 22-ICA-225 (relating solely to tax year 2015), concerns Equinor's untimely petition filed with the OTA.

### A. Severance Tax on Production Oil and Natural Gas

West Virginia imposes a tax upon natural gas producers for the privilege of severing natural resources within the state. W.Va. Code § 11-13A-3a(a). West Virginia's severance tax is based upon the gross value of natural resources severed and the rate of the tax depends on the type of natural resource severed. Severance tax on the production of oil and natural gas is generally "five percent of the gross value of the natural gas or oil produced, as shown by the gross proceeds derived from the sale thereof by the producer." W. Va. Code § 11-13A-3a(b). Gross value is further defined as "the market value of the natural resource product, in the immediate vicinity where severed, determined after application of post-production processing generally applied by the industry to obtain

10

commercially marketable or usable natural resource products." W. Va. Code § 11-13A-2(c)(6). For natural gas, "gross value is the value of the natural gas at the wellhead immediately preceding transportation and transmission." W. Va. Code § 11-13A-2(c)(6)(G). This wellhead value standard for severance tax on natural gas production is reinforced by West Virginia Code § 11-13A-2(c)(9) (excluding "conversion or refining" from tax base), § 11-13A-2(c)(11) (excluding "separation processes commonly employed to obtain marketable natural resource products" from the tax bases), and § 11-13A-4(c) (clarifying that "conversion and refining" processes are excluded from the privilege being taxed).

The "gross value" amount is determined by the "gross proceeds" derived by the producer from the sale of the natural gas. W. Va. Code § 11-13A-3a(b). Further, "gross proceeds" are defined as "the value, whether in money or other property, actually proceeding from the sale or lease of tangible personal property, or from the rendering of services, without any deduction for the cost of property sold or leased or expenses of any kind." W. Va. Code. § 11-13A-2(b)(5). Moreover, to assure the wellhead value is used in calculating severance tax on natural gas producers, the legislative rule expressly provides for the deduction of transportation and transmission costs from the gross proceeds derived when the sale of natural gas is not at the wellhead. W. Va. Code St. R. § 110-13A-4.8.

11

## B. Gross Proceeds, Gross Value of NGLs

Equinor's natural resource products are not directly sold at the wellhead. Instead, Equinor extracts the raw gas, performs some processing with its own equipment, and then transports or transmits the resource from its own facilities to the Plant Inlet at MarkWest's fractionation plant, where title to the resource passes to MarkWest. Equinor argues that the "net value" shown on settlement statements constitutes the entire gross proceeds derived by Equinor from the sale of the NGLs at issue. OTA affirmed the Tax Commissioner's determination that the "market value" of the natural gas extracted by Equinor should begin with "product value" reflected on the settlement sheets, subject to certain allowable deductions to arrive at wellhead value. We agree with Equinor and find error in OTA's decision.

A statute that is "clear and unambiguous" will be "applied and not construed." Syl. Pt. 1, in part, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968). "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970). "If the text of a statute, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995).

There are two relevant value figures at issue on each MarkWest-generated settlement statement. The so-called "product value" represents the monthly weighted average sales price per gallon that MarkWest receives for each type of NGL sold by MarkWest to third parties multiplied by the gallons of NGLs within the raw gas acquired by MarkWest from Equinor at the Plant Inlet. Certain "fees" are deducted from this calculated product value accounting for various transportation, marketing, and processing costs incurred by MarkWest.[9] The net value on the settlement statement is the result calculated by subtracting the fees from the product value. The net value calculation is the method to determine the total amount of consideration that Equinor actually receives from MarkWest for the natural resources delivered to MarkWest at the Plant Inlet.

---

[9] OTA rejected Equinor's contention that fees deducted from the product value on the settlement statements were borne by MarkWest based largely on a July 2018 settlement statement in which the "fees" for that month exceeded the stated "product value". For that one month, Equinor owed MarkWest for delivering the resource to the Plant Inlet. OTA viewed that one-month obligation as evidence that Equinor was directly incurring the expenses listed as "fees" on the product statement. While interesting, we find OTA's theory unavailing and inconsistent with the terms of the transaction between Equinor and MarkWest and market realities. There is no dispute that title passed at the Plant Inlet and that NGLs were thereafter the sole property of MarkWest. The settlement statements reflected a calculation of the gross amount Equinor was to receive. Moreover, market prices for a commodity (especially prior to processing and delivery to an end-user) are dependent upon a number of market forces (supply, demand, futures markets, etc.) and are not dependent upon a producer's costs of production. In this particular month, the market price (value) of the commodity at the wellhead was less than zero, which is certainly not without precedent. *See, e.g.*, James W. Coleman, *State Energy Cartels*, 42 Cardozo L. Rev. 2233, 2266-67 (2021) (discussing market forces that drove natural gas prices below zero).

Here, we find that the Tax Commissioner and OTA failed to adhere to the applicable statutes and legislative rule when determining the taxable gross value of the NGLs at the wellhead in the context of Equinor's refund claims. The product that first emerges from the ground is an impure mixture of various natural resources, water, and sediment. Equinor processes and transports that mixture into "raw gas" that then conforms to MarkWest's pipeline specifications, so that the product can be delivered to MarkWest. MarkWest then has the burden to turn the raw gas into NGLs that can be sold to third parties at prices MarkWest exclusively negotiates. In this case, the correct figure to determine the value of the NGLs at the wellhead for severance tax purposes is the gross amount Equinor receives from Mark West, not the product value shown on the settlement statements reflecting the method by which the parties compute purchase price using dynamic market information based on MarkWest's sales of processed product to third parties. For these reasons, we find that the OTA was clearly wrong when it improperly determined that the settlement statement's product value should be used to determine the gross value of natural resources produced by Equinor as delivered to the Plant Inlet for severance tax purposes.[10]

---

[10] This appeal reveals practical challenges in complying with and administering the severance tax on natural gas production. First, wellhead valuation is an inherently difficult task. Second, the governing contracts and settlement statements in this case were not drafted with severance tax in mind. Third, Equinor significantly overstated the gross value in its initial severance tax filings, resulting in large refunds awarded by the Tax Commissioner even before considering the issues raised in these appeals. However, the Tax Commissioner's well-meaning attempt to extend the tax to greater values than amounts actually received by a producer from an unrelated third party must be tempered in this context by the long-standing judicial limitations placed on the Tax Commissioner's

14

### C. Transportation and Transmission Allowance

Having determined that the gross value of the natural resources produced by Equinor at the Plant Inlet is indicated by net value figures on the settlement statements generated by MarkWest for the periods at issue, we turn to the determination of gross value at an earlier step in the process—wellhead value. The operative legislative rule provides certain methods to compute an allowance for transportation and transmission when natural gas is not sold to a third party at the wellhead. Relevant to this appeal, the producer may either deduct the actual costs of transportation and transmission or apply a flat 15% deduction, known as the "safe harbor" deduction. *See* W. Va. Code St. R. §110-13A-4.8.1 and -4. The OTA held that Equinor impermissibly attempted to use both actual transportation and transmission costs and the safe harbor deduction when it claimed the safe harbor deduction. According to OTA, Equinor had already deducted the actual costs of transportation and transmission expenses in the form of the fees set forth on the settlement statements. Again, we disagree.

---

determinations of values subject to taxation concerning natural gas production reflecting constitutional contours. See *Hope Natural Gas Co. v. Hall*, 274 U.S. 284, 47 S.Ct. 639 (1927) (finding that the predecessor to the West Virginia severance tax avoided invalidation under the commerce clause of the United States Constitution because the Supreme Court of Appeals of West Virginia had judicially limited the State Tax Commissioner's method of determining gross proceeds in *Hope Natural Gas v. Hall*, 102 W.Va. 272, 135 S.E. 582 (1926)) and syl. pt. 2, *Soto v. Hope Natural Gas Co.*, 142 W.Va. 373, 95 S.E.2d 769 (1956) (extending the judicially imposed wellhead valuation limitation to restrict the Tax Commissioner from taking an expansive view of gross value when imposing a privilege tax on natural gas production in the context of purely intrastate transactions).

Under the legislative rule, the "actual costs" option applies to true costs to the producer of transporting or transmitting "gas through the system of the producer from the well-mouth point of severance and production to the point of sale." W.Va. C.S.R. §110-13A-4.8.1. However, so-called fees on settlement statements drafted by MarkWest do not direct costs incurred by Equinor for transporting or transmitting raw gas through Equinor's own system from the wellhead to the Plant Inlet. The fees on the settlement statements reflect costs incurred by MarkWest and are considered in determining the price paid by MarkWest for resources delivered at the Plant Inlet. It is clear from the NGL Agreement that the fees listed on the settlement statement do not reflect the cost of natural resources moving through Equinor's system, as contemplated in the rule, because MarkWest owns and operates the fractionation plant and owns (or contracts for the use of) facilities through which MarkWest's NGLs move after leaving MarkWest's plant. W.Va. C.S.R. §110-13A-4.8.1.

Moreover, the transportation and transmission "fees" set forth on the settlement statements were not incurred after the wellhead and before the point of sale. *Id.* Instead, the fees shown on the settlement statements are incurred *after* the point of sale and Equinor delivers the natural gas to MarkWest at the Plant Inlet. Pursuant to West Virginia Code § 11-13A-2(b)(10), "sale" includes any transfer of the ownership or title to property. Here, it is undisputed that title to NGLs transferred to MarkWest at the receipt point, which is designated as the Plant Inlet.

16

Equinor was entitled to an allowance for transmission and transportation expenses from the wellhead to the Plant Inlet. Based on our determination that Equinor had not already deducted its actual costs incurred prior to the point of sale, Equinor was entitled to assert the safe harbor deduction provided in West Virginia Code of State Rules § 110-13A-4.8.4. For these reasons, we find that the OTA erred when it rejected Equinor's utilization of the 15% safe harbor deduction for transmission and transportation as reflected in its claims for refund.

### D. Untimeliness of 2015 Tax Year OTA Petition

The Tax Commissioner alleges a cross-assignment of error in case 22-ICA-225 (tax year 2015), arguing OTA did not have jurisdiction to hear Equinor's 2015 tax year petition filed nearly 11 months after the 60-day statutory deadline expired. We agree with the Tax Commissioner.

The deadline at issue is set forth in West Virginia Code § 11-10-14(d)(1): "no petition for refund or credit may be filed more than sixty days after the taxpayer is served with notice of denial of taxpayer's claim."[11] This 60-day appeal deadline was expressly set forth in the Tax Commissioner's notices of refund denials issued to Equinor.

---

[11] The statutory procedure (including deadlines) in the Tax Procedure and Administration Act is the "sole method of obtaining any refund [or] credit… in lieu of any other remedy…." W. Va. Code § 11-10-9(i).

West Virginia Code § 11-10A-9 reinforces the critical importance of a timely filed petition to initiate a proceeding before OTA. *See* W. Va. Code § 11-10A-9(a) ("shall be initiated by a person *timely* filing a written petition") and -9(b) ("a petition filed pursuant to subsection (a) of this section is *timely* filed if postmarked or hand delivered to [OTA] within sixty days of the date a person received written notice of… denial of a refund or credit…") (emphasis added). We agree with the Tax Commissioner that the Legislature intended to impose strict jurisdictional deadlines in connection with tax refund claims.

The Supreme Court of Appeals of West Virginia held that "[a] taxpayer's failure to abide by the express procedures established for challenging a decision of the West Virginia State Tax Commissioner, enunciated in West Virginia Code § 11-10-14(c) and (d) (1995), precludes the taxpayer's claim for refund or credit." Syl. pt. 1, *Bradley v. Williams*, 195 W. Va. 180, 465 S.E.2d 180 (1995). Moreover, the Supreme Court of Appeals stated that "filing requirements established by statute, like the ones involved in the instant case are not readily susceptible to equitable modification or tempering." *Helton v. Reed*, 219 W. Va. 557, 638 S.E.2d 160 (2006).

In its original order dismissing Equinor's 2015 tax year petition as being untimely, OTA acknowledged that taxpayers often seek equitable relief in tax matters and, to the best of the Chief Administrative Law Judge's knowledge, OTA—created over 20 years ago—had never ruled that the Tax Commissioner should be equitably estopped. The

18

original order conceded that it regularly dismisses petitions filed outside the 60-day time limit.

OTA's original dismissal order was reversed by the circuit court which found that OTA had misapplied standards in considering equitable estoppel against state agencies in a per curiam case concerning incorrect written assurances provided to a state employee in connection with her pre-retirement planning upon which she relied. *Hudkins v. State Consolidated Public Retirement Board*, 220 W. Va. 275, 674 S.E.2d 711. OTA viewed *Hudkins* as requiring affirmative misconduct or wrongful conduct by the government or government agent to be established by a taxpayer to apply equitable estoppel to the Tax Commissioner. The circuit court, relying solely on *Hudkins*, disagreed and ordered OTA to consider six factors considering public policy implications of estoppel. On remand, OTA applied estoppel to deny the Tax Commissioner's motion to dismiss for Equinor's late filing.

We disagree with the circuit court's construction of *Hudkins*, at least as it applies to extending tax filing and appeal deadlines in light of the clear jurisdictional language of the Tax Administration and Procedure Act. OTA's longstanding practice of requiring a taxpayer to prove affirmative misconduct or wrongful conduct by the Tax Commissioner before even considering equitable estoppel principles affecting OTA's

19

jurisdiction is in line with our reading of the extremely limited holding[12] in *Hudkins* considering on-point tax administration jurisprudence holding that clear statutory appeal deadlines are not subject to equitable modification. *See Cate v. Steager*, 2017 WL 2608435 (June 16, 2017) (memorandum decision) (citing a long line of cases restricting the use of equitable modification in tax cases, including cases decided after *Hudkins*). In its initial dismissal order OTA properly determined that Equinor did not establish affirmative misconduct or wrongful conduct by the Tax Commissioner in this case and the circuit court erred in its order by failing to consider the longstanding tax jurisprudence in West Virginia refusing to apply equitable estoppel principles to tax disputes on facts more compelling than those in this case.

We note that Equinor is a sophisticated party with extensive resources. Equinor is or should have been acutely aware of the importance of jurisdictional time limits in tax matters. Under the facts of this case, Equinor mistakenly relied upon advice it received during a phone call between its accounting firm and a Tax Department employee. Equinor was not instructed to refrain from filing a timely form petition with OTA that would preserve its right to appeal the second notice (which was in writing and notified Equinor of the strict appeal deadline), within the 60-days after it was issued. Based on the foregoing, we decline to find that a highly sophisticated party like Equinor cannot avail

---

[12] The Supreme Court of Appeals not only issued *Hudkins* as a per curiam decision, but it also further limited the application of its decision by "expressly limiting our decision to the specific facts of this case." *Id*. 220 W.Va. at 282, 647 S.E.2d at 718.

itself of equitable estoppel to expand OTA's jurisdiction to consider objections to the Tax Commissioner's determinations concerning tax year 2015 and reverse the circuit court's finding to the contrary. Accordingly, we reverse OTA's decision in 22-ICA-225 which was based upon the circuit court's order and direct OTA to dismiss Equinor's petition for tax year 2015.

## IV.    CONCLUSION

For the foregoing reasons, we reverse OTA's decisions in 22-ICA-111 and 22-ICA-226 and remand these cases to OTA for orders directing the State Tax Commissioner to refund Equinor the amounts determined in accordance with this opinion. We further reverse OTA's decision in 22-ICA-225 and remand this case to OTA for an order dismissing the petition concerning tax year 2015 as untimely.

Reversed and Remanded with Directions.